**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

Jane Doe,                                              Case No.

            Plaintiff,

                                 **Complaint**

     v.                                              *Jury Trial Demanded*

Carleton College,

            Defendant.

---

For her Complaint, Plaintiff Jane Doe hereby states and alleges upon knowledge, information, and belief as follows:

### Introduction

1.      "Grooming" is a method used by offenders to build trust with a victim to gain access to and time alone with the victim.  Grooming is typically a slow process in which the predator takes subtle approaches designed to systematically break down interpersonal barriers and facilitate a relationship.  The offender may assume a caring role, befriend the victim, and even exploit a position of trust and authority to groom the victim.  College-age women—balancing a grueling education and financial demands, while freshly "legal" and fending for themselves for the first time—are particularly susceptible to grooming.

2.      Between 2019 and 2022, Jane was a Carleton College student and fell victim to Carleton's employee, Smith, who engaged in a campaign of systematically breaking down Jane's barriers by acting as if he cared for her well-being and wanted to mentor her.

1

3.      In reality, Smith exploited the trust he so strategically cultivated with Jane and abused his position of authority over Jane as her professor and supervisor to ultimately assault Jane multiple times.

4.      As Carleton's Assistant Director of Institutional Research and Assessment, Smith was provided unfettered access to students' personal information, and as Carleton's Salsa dance instructor, unfettered access to their bodies.

5.      Jane brings this action against Smith to prevent him from victimizing others, and against Carleton for placing Smith in a position to abuse Jane, failing to supervise Smith's conduct, retaining Smith despite his ongoing misconduct, and being deliberately indifferent to the ongoing sexual harassment Jane experienced at the hands of Smith.

## Jurisdiction & Venue

6.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1332, and 20 U.S.C. § 1681.

7.      This Court has supplemental jurisdiction over the state law assault, battery, bias offenses, sexual abuse, negligent hiring, retention, and supervision, and negligence claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota.

## Parties

9.      Plaintiff Jane Doe is a female resident of New Delhi, India, and a former student at Carleton College.

2

10.     Jane is proceeding under a pseudonym to protect her privacy as a victim of sexual assault.

11.     Jane's identity and legal name is known to Defendant.

12.     Jane will be further identified under the terms of a protective order.

13.     Defendant Carleton College ("Carleton") is a liberal arts college with a total of about 2,000 students.  Carleton is located within the incorporated area of the city of Northfield, Rice County, Minnesota.

14.     At all relevant times, Carleton employees, including Smith, acted within the course and scope of their employment duties at Carleton, making Carleton vicariously liable for their actions as a result.

15.     Carleton is a corporation in the business of providing elite higher education and is registered with the Minnesota Office of Higher Education.

16.     Carleton is a recipient of federal funds as contemplated by the Education Amendments of 1972 ("Title IX"), codified at 20 U.S.C. §§ 1681-88.

17.     Carleton owns, possesses, and controls the tax-exempt real property in Rice County upon which its buildings are located (hereinafter "campus").

### Factual Allegations

**A.     Smith used his position with Carleton to groom Jane.**

18.     With a relatively small student body, Carleton's website boasts that it provides "unmatched teaching in a close-knit community," with an 8:1 student to faculty ratio.

19.     Drawn by Carleton's promise of community and an elite education, Jane left her family and home in India as an eighteen-year-old and traveled thousands of miles alone to pursue her college education in America.

20.     In August 2019, Jane began her freshman year at Carleton, planning to major in cognitive science.

21.     Shortly after beginning the term, Smith offered a Salsa dance workshop.

22.     Jane had been trained in classical Indian dance since she was four years old and participated in dance performances frequently throughout her life.

23.     Jane decided to attend Smith's Salsa dance workshop because of her dance experience and the opportunity to learn a new type of dance.

24.     In the workshop, Smith promoted a Salsa elective course that he would teach the next term.

25.     Carleton's academic catalog stated that Salsa course was "[t]aught by an instructor with extensive competitive and professional experience," and "aim[ed] to help students find self-confidence and self-expression through salsa."

26.     Due to her background as a classical Indian dancer and the description in the Academic Catalog, Jane enrolled in the class.

27.     Almost immediately, Smith began to single out Jane for personalized attention.

28.     Smith frequently selected Jane for demonstrations in class, referring to her as "killer," and praising the then-18-year-old Jane for having a "gift."

29.    In three short months, Smith strategically placed himself in a position of mentorship over Jane.

30.    Smith would invite Jane to group dinners at the campus-adjacent home he shared with his wife (also a Carleton alum), and on daily walks in the Carleton arboretum.

31.    At some point in the winter term, Jane mentioned that she was struggling to pay for one of her textbooks.

32.    In response, Smith stated that he knew Jane was a Pell Grant recipient from a low-income bracket.

33.    Smith had this information because he used his position as Carleton's Assistant Director of Institutional Research and Assessment to access Jane's personal and financial information.

34.    Smith told Jane that she qualified for a federally funded assistance program that covered textbook costs.

35.    Smith personally reached out to the program's staff to get Jane enrolled, and in the meantime, insisted on covering the cost of the textbook.

36.    Jane was grateful for his assistance and generosity, and wrongfully assumed Smith had good intentions.

37.    When the winter term ended in early 2020, Smith left Jane a typed note in her mailbox, offering to train her to become his co-instructor to teach future Salsa classes with him.

38.    The 2020 spring term of Jane's freshman year was disrupted by the COVID-19 pandemic.

39.     Janes classes were converted to e-learning and all dance classes were cancelled.

40.     In fall 2020, Smith resumed grooming Jane when classes returned to in-person instruction.

41.     Smith began inviting Jane to practice dance skills with him privately in his on-campus office.

42.     Smith boasted that his credentials included studying at the Philadelphia Dance Academy as a child, winning the under-18 World Salsa Championship with his former dance partner, regularly attending the annual Salsa Congress, and having ties to famous dancers such as the highly decorated Alien Ramirez.

43.     Given Carleton's prestige and promise of "unmatched teaching," Jane had no reason to doubt Smith's purported accolades.

44.     Eager to learn and excited by the prospect of teaching dance alongside an expert, Jane attended private practices in Smith's office on at least ten occasions.

45.     At these private lessons, Smith taught Jane about the culture surrounding Salsa dance and introduced Jane to a principle he called "Real but not True," purporting that "real mastery" demanded intensity, sensual moves, and sexual chemistry, but without any actual sexual intentions or feeling.

46.     Trusting Smith as a mentor and an expert on the subject, Jane took these comments at face value, subduing any concerns that Smith's conduct was inappropriate.

47.     Smith worked to further build trust and foster dependence by confiding in Jane, giving her special treatment, and extending favors.

48.     This grooming included but was in no way limited to sharing confidential information about Carleton with Jane, giving her small gifts, and offering transportation to Jane and her friends, who did not have a car.

49.     Furthermore, Smith's wife was frequently present, subduing any of Jane's concerns that Smith had ill-intentions and creating an impression of genuine care and concern for Jane's well-being.

**B.      Smith began to exert control over Jane's life.**

50.     As a Pell Grant recipient, student employment was a mandatory part of Jane's student aid.

51.     For her freshman and sophomore years, Jane worked in the IT services department, earning $11.75 per hour.

52.     Smith relayed to Jane that he had gotten approval to hire her to co-instruct his Salsa course for the fall of 2021.

53.     Smith's job offer came with a substantial pay increase: $18 per hour compared to the $11.75 she had been making.

54.     Jane accepted Smith's offer, becoming an employee of Carleton and under the direct supervision of Smith.

55.     Consequently, when Jane returned to Carleton for her junior year in the fall of 2021, not only was she enrolled in Smith's intermediate Salsa class for credit, she was also Smith's co-instructor for Salsa I.

56.     As Smith inserted himself more and more into Jane's life, he would share with her confidential information that he obtained through his role as Carleton's Assistant Director of Institutional Research and Assessment and on Carleton's President's Council.

57.     As the fall term progressed, Smith began to confide in Jane more frequently and in increasingly inappropriate ways.

58.     Smith explained that his wife allowed him to have sex with other people because he had a "dark side" that she could not handle.

59.     Smith told Jane that he and his old dance partner were "fuck buddies" because the emotional intensity was the basis for their dancing connection.

60.     Smith also shared that he had an ongoing sexual relationship with one of Jane's former IT department supervisors who had attended Jane's Salsa course and participated in a demonstration with Smith.

61.     Smith made sexually explicit comments to Jane like, "I could never have someone sit on my face because that's a beta thing," "I have this crazy technique that can make any woman cum in seconds," and that his friends' wives would ask him for said technique.

62.     Smith also told Jane about his violent tendencies, explaining that:

a)  his family was wealthy, but abusive;

b)  he was highly trained in mixed martial arts and his nose had been broken so many times that his doctor thought he was a victim of domestic violence;

c)  he was an expert knife fighter, who always had at least one knife on his person;

d) he kept two guns in his house, one of which was a shotgun.  Jane personally saw the shotgun during one of her visits to his home;

e) he had been in many fights, frighteningly claiming that in one fight at a tennis competition, he nearly beat his opponent to death with a tennis racket;

f) he taught live classes on sexual domination with a partner across the country, both in the past and while he was working at Carleton;

g) he was a diagnosed sociopath who had intense issues with anger and violence and had been seeing a therapist since his youth; and

h) his therapist was required to regularly administer tests to assess his risk of violence, and he had scored "in the yellow" since the pandemic.

63.    Jane began to fear getting on her mentor's bad side.

64.    Jane believed that Smith would become agitated if she were to ever respond negatively to him.

65.    As Smith's student and paid assistant, Jane attempted to write the comments off and focus on her finances and busy schedule.

66.    Smith required Jane to teach alongside Smith twice weekly, as well as meet at his house every weekend for two to three hours to lesson plan, learn new moves, and practice.

67.    Smith indicated to Jane that these at-home practices were part of her mandatory work hours.

68.    Adjacent to Carleton's campus, Smith's home was an extension of his Carleton workplace.

69.    Jane believed her presence in his home was innocuous, as his wife was often present.

9

70.     Smith's home was directly across the street from Dean Carolyn Livingston, a member of Carleton's Sexual Misconduct Support Team.

71.     Upon information and belief, Dean Livingston saw Jane come and going from Smith's house on several occasions.

72.     As the fall term progressed, Smith explained that the two were becoming "dance partners," a designation that he said carried a lot of weight in Salsa culture.

73.     Smith then suggested that achieving a certain level of "connection" would open doors for Jane to master advanced techniques and participate in events like the annual Salsa Congress.

74.     As a trained classical Indian dancer, Jane believed Smith's instruction was genuine.

75.     Classical Indian dance emphasizes the importance of strict adherence to rules, technical perfection, and deference to the teacher, or "guru."

76.     In her classical training, Jane had experienced discomfort and uncertainty when perfecting her craft and understood that on occasion, a guru may ask their students to do things that are difficult to understand.

77.     Jane carried the *guru-shishya* tradition into her practice of Salsa and believed the discomfort she felt by Smith's behavior was part of the learning process and was helping her perfect the craft of Salsa.

78.     Smith stated that Jane's growth was hindered by her commitment to the *guru-shishya* tradition she learned as a classical Indian dancer.

10

79.    Specifically, Smith stated that there was still too much "distance" between them when they danced, that she was not assertive or sensual enough, and that she had to stop treating him like a teacher.

80.    Smith insisted that she needed to overcome these concerns to progress.

**C.    Smith's behavior escalated to physically assaulting Jane.**

81.    At the end of the fall 2021 term, Jane had to move out of the dorms and needed a place to stay for two days until her flight to see family departed.

82.    Smith offered to let Jane stay in his guest bedroom.

83.    Having limited housing options and financial resources, Jane accepted Smith's offer.

84.    On the evening of November 28, 2021, Smith suggested the two head to the basement and play "Truth or Dare" to break the "guru-student ice" and "act like equals."

85.    Smith provided Jane with alcohol despite her being just twenty years old at the time.

86.    Smith knew that Jane was not old enough to legally drink alcohol.

87.    After consuming the beverage Smith provided to her, Jane felt more drunk than she had expected to feel after one drink.

88.    Smith pressured Jane to have another drink.

89.    Jane declined and Smith decried her declination and poured her another drink.

90.    Smith then began making sexual comments to Jane, including that he had vivid sexual dreams about her.

91.    Jane's memory of what occurred the rest of the evening is hazy, but she remembers feeling a deep unease.

92.    She also remembers vomiting into the toilet.

93.    The next morning, Jane woke in the guest bedroom more hungover than she would have expected to feel after two drinks.

94.    Jane had no recollection of how she got from Smith's basement to the guest bedroom.

95.    Jane had red marks around her throat.

96.    Jane had no recollection of how she got the red marks around her throat.

97.    Jane confronted Smith about his actions the previous night and Smith swore her to secrecy, stating that he would lose his job if she came forward.

98.    Smith justified his actions by stating he would be "stupid" if he was not attracted to her.

99.    Smith told Jane that "the option was there" if she ever wanted a sexual relationship with him.

100.   Smith then bragged about his genitalia and sexual prowess, stating it would be wise to use the chemistry and attraction he believed they had to improve their dancing as it would help erase the teacher-student dynamic.

101.   Smith told Jane, "all serious dance partners fuck."

102.   This statement was in direct contradiction to his previous statement that mastery of salsa requires chemistry without intentions and his mantra of "Real, but not True."

103.    The following day, Smith messaged Jane saying, "Thanks for both real and true."

104.    Smith continued to insert himself in Jane's life and display grooming behavior.

105.    During the 2021-2022 winter break, Smith brought Jane to an event to introduce her to a notable Carleton alumnus.

106.    At the start of the next term, Smith picked Jane up from the airport upon her return from break.

107.    During the 2022 winter term, Jane attempted to assert boundaries with Smith but Smith continued his escalating behavior, including:

    a) frequently telling Jane he was attracted to her;

    b) informing Jane that dancing with her "got him excited" to a point where he had to expend significant effort to "hold himself back";

    c) attempting to be flirtatious both in person and via text;

    d) routinely telling Jane that other women found him irresistibly attractive, including his students;

    e) accusing Jane of "being distant" when Jane tried to keep their contact strictly work-related;

108.    On January 27, 2022, Smith left a large bouquet of flowers in Jane's student mailbox located in the student center.

109.    Other students observed the gesture and Jane felt very embarrassed.

110.    Smith informed Jane that a student who was attracted to him was enrolled in their co-instructed Salsa class, and that a fellow student reported to Carleton's Title IX that the student was overheard professing her sexual desire for Smith.

111.   Smith made comments to Jane like, "I know you want me all to yourself," before stating that he would be dancing or dining with another student.

112.   Smith also claimed to be a masseuse who had professionally massaged many dancers and insisted on massaging Jane's back.

113.   Jane finally relented and allowed him to massage her back one time.

114.   While performing the massage, Smith kissed Jane between her shoulder blades.

115.   Jane was stunned.

116.   Smith then quickly ran out of the room before Jane could react.

117.   Smith also regularly complained about another dance student, stating she was boring and fearful.

118.   Smith told Jane that the other dance student had refused to participate in a passionate kiss on the mouth with Smith as the grand finale of a routine.

119.   Smith then stated that a "dancer's kiss" was a common artistic gesture in salsa, and that not being able to perform one would greatly limit her as a dancer.

120.   Smith requested Jane to engage in a "dancer's kiss" with him and she refused.

121.   Smith responded that he was disappointed in her.

122.   As a result of Smith's worsening behavior, Jane's mental health depleted.

123.   Jane's distress from Smith's targeted behavior toward her caused her grades to suffer.

124.   While Jane attempted to minimize contact with Smith, she believed she needed to be careful not to anger Smith.

14

125. Jane feared if she attempted to set clear boundaries and express her desire for him to stop his inappropriate and sexually explicit conduct toward her, Smith would become resentful, retaliatory, angry, and possibly violent.

126. Jane believed if she did not placate Smith, he might withhold providing her with a recommendation for her application to an off-campus studies program.

127. Jane also feared if she did not continue to pacify Smith, he would terminate her position as co-instructor of the Salsa course.

128. Jane even feared Smith could become physically violent toward her if she did not appease him.

**D.     Smith's behavior continues to escalate and Smith sexually abuses Jane.**

129. On January 28, 2022, Jane turned 21 years old.

130. Smith knew it was her birthday and invited her to his house.

131. Jane declined his invitation.

132. Smith pleaded with her to come over, stating he prepared her a birthday gift.

133. Jane eventually relented and agreed to go to his house to pick up the gift.

134. When Jane arrived, she saw that Smith had arranged strips of paper, face down, on his coffee table.

135. Smith explained that each strip of paper had something advantageous or embarrassing for the birthday person to perform.

136. Smith claimed this game was a birthday tradition he shared with only his closest friends.

137. Hesitant and fearful not to anger Smith, Jane chose a strip of paper at random.

138.   Jane's first two selections won her $75 and a promise that Smith would purchase Jane a nice bottle of alcohol.

139.   Jane's third selection, however, stated "20 hits by hand."

140.   Smith began to aggressively spank Jane on the buttocks over her jeans.

141.   Jane did not consent to this touching.

142.   Smith's slaps to Jane's buttocks caused her significant physical pain.

143.   Smith's actions constituted "nonconsensual sexual contact" amounting to "Criminal Sexual Conduct in the Fifth Degree" pursuant to Minnesota Statute Section 609.3451, subdivision 1(a).

144.   During and after Smith's attack, Jane felt scared because she did not know if Smith would become even more physically aggressive toward her.

145.   After Smith sexually assaulted Jane, she was in a state of shock.

146.   As Jane attempted to make sense of what had just occurred to her, she picked up another piece of paper, which was also sexual in nature.

147.   Jane then ended her participation in the birthday "gift" by suggesting Smith and she practice dancing instead.

148.   Jane suggested this because she believed that would prevent Smith from further violence.

149.   Moments after beginning to dance, Smith bit Jane on her shoulder.

150.   Jane did not consent to this touching.

151.   Smith's bite on her shoulder caused Jane physical pain.

152.   As Jane attempted to pull away, Smith bit Jane's ear.

153.   Jane did not consent to this touching either.

154.   Smith's bite on her ear caused Jane physical pain.

155.   Smith then pushed his body into Jane's body to back her into his kitchen island.

156.   Smith then pinned her wrists to her sides.

157.   Jane was horrified and unable to break free.

158.   Jane observed that Smith appeared to be visibly enjoying himself.

159.   Smith then placed one hand around Jane's throat and stated, "You know that I am good enough at this to get paid for [sex].  You know that I want you.  How do you hold yourself back from me?"

160.   Jane had not consented to this touching.

161.   Terrified of what Smith might do next, Jane believed she needed to answer his question and stated that she never thought about it.

162.   After a period of silence, Smith released Jane's throat and hands.

163.   Jane immediately left.

164.   After taking a couple of days to try to make sense of what Smith had done to her, Jane confided in her friend about the horrifying incident.

165.   The next day, Jane texted Smith to express objection to his treatment of her, reaffirm that she was not interested in him sexually, and demand that he stop his advances.

166.   Smith responded by apologizing, stating that he hated himself and felt like a tremendous failure.

167.   Smith promised he would abide by Jane's boundaries.

168.    As a result of Smith's ongoing sexual harassment, escalating behavior, and violent attacks, Jane's mental health had deteriorated.

169.    Jane withdrew and struggled to attend class or do work because of the immense shame and humiliation.

170.    Jane ultimately missed the deadline to submit her off-campus studies application.

171.    Jane saw a therapist to discuss the emotional distress she felt because of Smith's conduct.

172.    With Jane's permission, her therapist called Carleton Dean Trey Williams and told him that Jane needed certain accommodation to keep up with her studies.

173.    On February 3, 2022, Smith messaged Jane begging her to see him in person so he could apologize appropriately.

174.    Reluctantly, Jane agreed in hopes the conversation would reduce her anxiety around fearing Smith would continue his harassment and assaults.

175.    Instead, Smith attempted to manipulate Jane further.

176.    Smith stated Jane needed to show him "perspective and empathy," while reminding her that she was obligated to co-instruct an upcoming dance workshop with him on February 7, 2022.

177.    On the date of the workshop, Jane walked in before class to see Smith crying on the floor of the dance room, with his head in his hands.

178.    Smith begged for Jane's forgiveness and blamed his recent behavior on his wife's illness.

179.    With more than 70 students in the hallway waiting to begin the workshop, Jane said she forgave him to get him off the floor.

180.    Moving forward, Jane tried to avoid seeing Smith, using her academic workload as an excuse.

181.    Jane's anxiety and depression worsened, and her grades continued to plummet.

182.    On February 13, 2022, Jane informed Dean Williams that she had been assaulted by a Carleton staff member at his home and that, due to the mental distress of that trauma, she needed his help to obtain accommodations such as extensions and excused absences to succeed that term.

183.    Jane did not share that Smith was the attacker because she knew that Dean Williams was mandated to report what she would tell him.

184.    She feared that Smith would be notified of her report and would use his ties to the college to harm her academically.

185.    Jane also feared that Smith might physically harm or even kill her for speaking up.

186.    Dean Williams told her that it was solely her responsibility to meet with each professor individually to negotiate accommodations if she desired them.

187.    Without his assistance, Jane had to negotiate accommodations with three separate professors.

188.   Because of Smith's conduct and Carleton Dean Williams' refusal to support Jane in obtaining the required academic accommodations, Jane ultimately failed a class the winter term, entering the spring 2022 term behind on credits and off track for her major.

189.   Again, Smith used his job in institutional research to uncover information on Jane which he used to position himself to later abuse her.

190.   Smith used his access to the databases to check Jane's academic progress, learning that she needed an additional PE credit to graduate.

191.   Smith then worked with the registrar to provide Jane instructor permission to enroll in Salsa II as a credit-earning student, even though she would be co-instructing the class.

192.   Smith also approached Professor Judith Howard, the Carleton's Chair of Theatre and Dance,  and proposed Jane participate in an independent study for the latter half of the 2022 spring term.

193.   The independent study was a for-credit academic course where Smith would teach Jane Latin dance, one-on-one.

194.   Desperate to graduate, Jane accepted the course.

195.   The independent study required Jane and Smith to perform in front of Professor Howard.

196.   In preparation, Smith emailed Jane detailed instructions on how to act and what to say.

197.   On February 28, 2022, Smith and Jane performed for Professor Howard.

198.    Two days later, Professor Howard emailed Carleton's Title IX Coordinator, Laura Riehle-Merrill, to request a conversation about a situation involving "boundaries between students and teachers" that "may or may not merit concern."

199.    Smith and Jane's performance had prompted Professor Howard to make this inquiry.

200.    Two days later, Riehle-Merrill and Professor Howard met via Zoom and Professor Howard described "excessive closeness" between Jane and Smith during the performance.

201.    Professor Howard expressed reservations about their upcoming independent study.

202.    Professor Howard commented that one-on-one dancing with a student was "highly unorthodox," and expressed concerns about Jane being exploited.

203.    Riehle-Merrill now possessed both the February 13 Community Concern Form reporting that Jane had been assaulted by an staff member, and Professor Howard's March 4 oral report of Smith's concerning conduct towards Jane.

204.    Riehle-Merrill did not investigate Professor Howard's concerns.

205.    Riehle-Merrill's failure to act on such a report was in violation of Carleton's Title IX policies and procedures.

206.    Instead, Riehle-Merrill encouraged Professor Howard to "define boundaries" for both parties.

207.    Riehle-Merrill dispelled Professor Howard's concerns and the independent study was approved on April 12, 2022.

21

208.    The following day, Jane was notified that she had been placed on academic review, meaning she was required "to take and pass all remaining credits with a 'C-' or better in each course and have a term GPA of at least 2.00 to avoid suspension.

209.    Jane felt even more trapped.

210.    Jane's independent study commenced in the latter half of the spring semester and required she work one-on-one with Smith on Carleton's campus twice per week.

211.    Professor Howard was the "faculty supervisor" for the independent study.

212.    Professor Howard provided no supervision of Smith and was formally off-campus most of the term.

213.    Smith's harassing behavior toward Jane continued to escalate.

214.    For example, Jane preferred to wear long pants while dancing, but Smith told her that her modesty was hindering her progress.

215.    Smith bought Jane short, spandex shorts and directed her to wear them to her independent study to get more comfortable with her body.

216.    Smith stated that if Jane was not comfortable showing her legs in their one-on-one practices, she would never be a successful performer because she lacked the required confidence.

217.    Jane believed Smith.

218.    Smith also made inappropriate comments, such as stating Jane had a "nice ass" and that Jane had "energy that [said] 'I probably won't fuck you, but keep trying.'"

219.    During their one-on-one instruction on Carleton's campus, Smith would grab and spank Jane's buttocks.

220.    Jane did not consent to this touching.

221.    Smith would mime ripping off Jane's clothes.

222.    Smith would forcibly kiss Jane during and after dances.

223.    Jane did not consent to this touching.

224.    At one point, Smith wore bandages on his knuckles, claiming to have "taken care" of someone who had gotten on his bad side.

225.    Jane understood Smith's comment to mean he had physically assaulted someone who angered him.

226.    On April 15, 2022, in the middle of their Salsa II class and in front of their students, Smith forcibly picked Jane up, squeezed her close, and spun her around while she resisted.

227.    Jane did not consent to this touching.

228.    Jane texted Smith to not do "shit like that."

229.    Smith again apologized and said it was an "innocent mistake."

230.    Given the requirements of her academic review and Carleton's prior refusal to help her, Jane believed she had no choice but to continue the independent study and to co-instruct the salsa class or face suspension.

231.    On April 18, 2022, Jane's friend met with Title IX Coordinator Riehle-Merrill to gain information on the process of reporting a staff member.

232.    Jane's friend spoke in hypotheticals about a "friend's" situation.

233.    Riehle-Merrill did not initiate any investigation in response to Jane's friend's questions.

234.   Four days later, Jane met with Carleton Dean Cathy Carlson and reported that she had been sexually assaulted.

235.   Dean Carlson stated that the Dean's Office would agree to waive Jane's probation given the extenuating circumstances.

236.   Dean Carlson directed Jane to email Dean Carolyn Livingston to provide her information regarding Jane's extenuating circumstances.

237.   Dean Livingston was a sitting member of Carleton's Sexual Misconduct Support Team.

238.   In response to Jane's email, Dean Livingston refused to lift the probation without further information, saying "you can send me an email outlining what you want me to know that would be sufficient to change the outcome of the decision."

239.   Jane was uncomfortable explaining the ongoing harassment and assaults by Smith in writing.

240.   Jane asked to meet Dean Livingston in-person.

241.   Dean Livingston never responded.

242.   Jane felt that she had to complete the independent study and to co-instruct the salsa class to avoid suspension.

243.   Jane became increasingly dependent on Smith to graduate.

244.   On April 28, 2022, Smith again forcibly kissed Jane.

245.   Jane did not consent to this touching.

246.   Jane accepted that Smith was not going to stop the harassment and assaults.

24

247.   On May 9, 2022, Jane met Title IX Coordinator Riehle-Merrill in-person and again reported Smith's harassment and assaults.

248.   Riehle-Merrill stated that since Smith was a staff member and not a professor, Carleton did not have to follow the "long, elaborate, or disruptive" Title IX procedure.

249.   Riehle-Merrill stated Smith could be fired quickly and without response if it was treated as an employment matter.

250.   Jane recounted Smith's history of harassment and assaults for use in a Report of Employee Conduct.

251.   Jane recounted many of the events, including when she woke up with bruises around her neck after Smith provided her with alcohol at his home.

252.   She also discussed the harassment she experienced day-to-day.

253.   Riehle-Merrill told Jane that she would help her get a restraining order or an order of protection.

254.   Riehle-Merrill relayed Jane's case to Carleton's Title IX Deputy/Faculty and Staff and Enterprise Risk Manager.

255.   That day, Jane skipped her independent study, telling Smith she had severe back pain.

256.   On May 10, 2022, Riehle-Merrill reached out to a nonprofit women's center for guidance on filing a Harassment Restraining Order ("HRO").

257.   Riehle-Merrill thought it sufficient to sloppily copy-paste the text of her Report of Employment Conduct into each section of the HRO form.

258.   Riehle-Merrill stated obtaining an HRO would be a "slam dunk."

259.   Smith continued teaching Salsa class.

260.   On May 12, Jane was informed that the HRO had been denied.

261.   On or around May 13, Smith was terminated and "banned" from campus.

262.   Without a restraining order and with Smith living so close to campus, Jane feared Smith would retaliate against her.

263.   Jane feared for her physical safety.

264.   On May 13, 2022, Riehle-Merrill told Jane that they could refile the HRO and organized a call with a lawyer to do so.

265.   The lawyer informed them that they could not refile the restraining order without an additional act of harassment by Smith that occurred after the date of the initial filing.

266.   Riehle-Merrill had ruined Jane's ability to obtain a harassment restraining order against Smith.

267.   Dean Carlson contacted Jane's parents, falsely stating that "[Jane] ultimately determined not to resubmit her application" for the HRO.

268.   The email did not mention that Jane was unable to refile the HRO due to Riehle-Merrill's misguidance.

269.   Riehle-Merrill directed Jane to talk with Carleton's Director of Security regarding any safety concerns moving forward.

270.   Jane met with the Director of Security that day to discuss her safety concerns and was advised of the following:

a) that Smith was banned from campus and that if anyone reported his presence to security, they would remove him. However, security technically could not prevent him from coming onto campus, because "campus" only consisted of the physical buildings, and not all the roads and sidewalks. Without the restraining order to prevent him from coming within a certain distance from her, this meant that Smith could continue his daily walks in the Carleton arboretum and furthermore, even if Smith was standing on the sidewalk directly in front of Jane's front door, Carleton security could not remove him;

b) that if Jane saw or was approached by Smith, she should "run";

c) that Smith was not allowed to have contact with any Carleton students, but that there was not a clear way to enforce that prohibition; and

d) that Jane would have to come to the security office and renew Smith's ban in exactly twelve months or it would expire while she was still a student.

271. On May 14, 2022, Riehle-Merrill emailed Jane, stating "[T]his is clearly a challenging and sensitive situation, we have taken every step to protect your privacy and hope that you will be thoughtful about how and with whom you share information and keep it as private as possible."

272. Two days later, the students currently enrolled in Smith's Salsa II class co-instructed by Jane received an email from Carleton's P.E. Department Administrative Assistant reading, "Due to circumstances beyond our control, the remainder of Salsa II class for spring term is cancelled. Everyone on the class roster will be receiving their PE credit for the term."

273. Carleton failed to provide any explanation to students as to why their class was suddenly cancelled.

274. Carleton did not inform its students, faculty, or staff that Smith was fired.

275. Jane was left to field questions from students about what had happened.

276.    Carleton never provided a statement regarding Smith.

277.    Carleton never reported Smith's conduct pursuant to the Clery Act.

**E.      Carleton's deliberate indifference to Smith's harassment and failure to adequately respond caused Jane's academic performance to suffer.**

278.    On May 20, 2022, Jane dropped a three-credit course after being advised that there was no avenue for her to pass.

279.    The class occurred three times per week from May 3rd to June 1st, so Jane had missed a significant portion of the course because of Smith's conduct and Riehle-Merrill's failed attempt to secure an HRO.

280.    To avoid suspension and to graduate on time, Jane was required to change her major from cognitive science to psychology.

281.    Jane petitioned Carleton's Academic Standing Committee to increase the number of external credits she was allowed to earn over the summer to six credits.

282.    On May 31, 2022, this request was approved and Jane requested assistance in finding and funding summer courses.

283.    Carleton did not provide any assistance to Jane.

284.    At the end of the spring term, despite Smith's ongoing and serious harassment and assaults, Jane had a high enough GPA to be removed from academic review.

285.    On June 22, 2022, Jane submitted a petition to the Academic Standing Committee asking to be removed from academic review, for approval to complete PSYC

200/201, and to receive a letter grade for her independent study, instead of the current designation of completion.

286.   More than a week later, Dean Livingston emailed her asking to meet to discuss her petition and "next steps" for Jane to be removed from academic probation.

287.   At home for the summer in India, Jane responded on July 5, 2022.

288.   As she had in April 2022, Dean Livingston failed to respond.

289.   Dean Livingston never met with Jane, acknowledged the assaults, or showed any genuine interest in helping ameliorate Jane's situation.

290.   Jane took 24 credits over the summer of 2022 to compensate for her credit deficit caused by Smith's conduct.

291.   Living in India, Jane was forced to attend classes via Zoom in the middle of the night.

292.   When Jane began at Carleton, she was ahead on credits due to her participation in a prestigious International Baccalaureate program, and she earned a B average in the fall term of 2019.

293.   During the years Smith groomed, harassed, and assaulted Jane, her grades yo-yoed from average to below average.

294.   Smith's conduct and Carleton's deliberate indifference to her situation caused Jane to drop several courses as she struggled to cope with the emotional distress caused by Smith and Carleton.

295.   At the height of Smith's violence, Jane's GPA plunged, and her surplus of credits fell into a deficit.

296.    Jane's GPA plummeted to 1.00 for the term.

297.    Despite fulfilling all the requirements by the close of the summer term, Jane was not removed from academic probation until December 2022, meaning that for the entirety of the 2022 fall term, Jane faced possible suspension.

298.    Even with the threat of suspension looming, after Smith's termination, Jane earned all A's and B's, and without the benefit of sufficient accommodations provided by Carleton.

**<u>Count One</u>**
**Title IX of the Education Amendments Act of 1972 - 20 U.S.C. § 1681 *et seq*.**

299.    Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

300.    Title IX prohibits educational organizations that receive federal funds, such as Carleton, from engaging in discrimination based on sex.

301.    Sexual harassment can constitute discrimination if it is so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school, and if the school has actual knowledge of the harassment.

302.    Recipients of federal education funds may be liable for damages if they are deliberately indifferent to known acts of sexual harassment by a teacher.

303.    Carleton responded in a manner that was deliberately indifferent to known acts of sexual harassment and sexual abuse perpetrated by Smith.

304.    The sexual harassment perpetrated by Smith occurred on campus or in his campus-adjacent home.

305.    As sanctioned by Carleton, Smith routinely held practices for school-related activities in his home, effectively turning his home into an extension of the classroom.

306.    Consequently, all sexual harassment perpetrated by Smith occurred under Carleton's control.

307.    As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

## Count Two
### Vicarious Liability Assault and Battery - Common Law

308.    Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

309.    Under Minnesota law, the intentional tort of battery is defined as an intentional and offensive contact with another person.

310.    Smith committed the tort of battery when he assaulted Plaintiff in manners including but not limited to:

a) Assaulting Plaintiff in Smith's home on the evening of November 28, 2021, causing severe bruising around her throat;

b) Kissing Plaintiff's back;

31

   c)  Assaulting Plaintiff in his home on the evening of January 28, 2022, by

       biting her ear, pinning her wrists, and spanking her on the buttocks, causing

       severe bruising to her buttocks;

   d)  Grabbing and spanking her buttocks during the independent study;

   e)  Forcibly kissing Plaintiff during and after dances.

311.   Plaintiff did not consent to Smith's assaults.

312.   Smith acted with intent to cause Plaintiff harm and/or offensive contact and put her in immediate fear for her well-being through his assaults.

313.   Under Minnesota law, an employer is liable for an assault by his employee when the source of the attack is related to the duties of the employee and the assault occurs within work-related limits of time and place.

314.   Smith's assaults occurred in the course of his mentorship in Salsa dancing.

315.   Carleton, as Smith's employer, is vicariously liable for Smith's conduct, as it was performed in the course and scope of his employment.

316.   As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

## Count Three
### Vicarious Liability Bias Offense - Minnesota Statute § 611A.79

317.   Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

318.     Minnesota law defines "bias offenses" as conduct that would constitute a crime that was committed because of the victim's membership in a protected class, including sex.  Minn. Stat. § 611A.79, subd. 1

319.     "A person who is damaged by a bias offense has a civil cause of action against the person who committed the offense." Minn. Stat. § 611A.79, subd. 2(1).

320.     Smith violated or engaged in conduct that would constitute violations of Minnesota criminal statutes prohibiting Sexual Abuse (§ 541.073, subd. 1(1)), and/or Assault in the Fifth Degree (§ 609.224).

321.     These violations were as a result of Plaintiff's sex (female) and national origin (Indian).

322.     Upon information and belief, Smith assaulted at least one other international female student of Southeast Asian descent.

323.     Carleton, as Smith's employer, is vicariously liable for Smith's conduct, as it was performed in the course and scope of his employment.

324.     As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

<u>**Count Four**</u>
**Sexual Abuse – Minn. Stat. § 541.073**

325.    Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

326.    Minnesota law provides that a person is entitled to civil damages for crimes falling under the umbrella of sexual abuse. Minn. Stat. § 541.073.

327.    "Sexual abuse" includes criminal sexual conduct in the fifth degree, which is defined, in relevant part, as when "a person engages in nonconsensual sexual contact." Minn. Stat. § 609.3451 subd. 1a(1).

328.    "Sexual abuse" also includes criminal sexual conduct in the second degree, which is defined, in relevant part, as when a person engages in sexual contact with circumstances existing at the time of the act cause the complainant to have a reasonable fear of imminent great bodily harm to the complainant, the actor causes personal injury to the complainant with coercion or force by inflicting bodily harm, or by attempting or threatening to inflict bodily harm and the complainant reasonably believe that the actor has the present ability to execute the threat. Minn. Stat. § 609.343 subd. 1(a); (c)(i),(ii); (d)

329.    "Sexual contact" is defined, in relevant part, as:

a)  nonconsensual touching by the complainant of the actor's intimate parts, effected by the actor, if the action is performed with sexual or aggressive intent, Minn. Stat. § 609.3451 subd. 1a(1);

b)  the intentional touching by the actor of the complainant's intimate parts, Minn. Stat. § 609.341 subd. 11(a)(i); and/or

c) touching of the clothing covering the immediate area of the intimate parts, Minn. Stat. § 609.341 subd. 11(a)(iv).

330.  "Intimate parts" include the primary genital area, groin, inner thigh, buttocks, or breast.  Minn. Stat. § 609.341 subd. 5.

331.  On more than one occasion, Smith committed crimes that meet the definition of sexual abuse, including but not limited to second and fifth degree criminal sexual conduct.

332.  Smith spanked Jane on the buttocks without her consent and with sexual and aggressive intent.

333.  Jane was reasonably fearful of Smith because he had told her that he was a sociopath with anger issues, disclosed details of a violent past, stated that he always had at least one knife on his person, and she personally saw a gun in his home.

334.  Smith continually emphasized that he felt he had to constantly resist assaulting Jane, placing her in fear of further sexual assault involving sexual penetration.

335.  An employer may be vicariously liable or liable under the doctrine of *respondeat superior* for sexual abuse claims.  Minn. Stat. § 541.073, subd. 4; *see also Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905 (Minn. 1999) (holding a group home may be vicariously liable for its employee's sexual assault of its minor resident based on evidence that it is a well-known hazard in the industry).

336.  Sexual assault of a student by an instructor is a well-known hazard in the dance and education industries.

337.    Carleton, as Smith's employer, is vicariously liable for Smith's conduct, as it was performed in the course and scope of his employment.

338.    As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

## Count Five
### Negligent Hiring - Common Law

339.    Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

340.    Defendant, through its agents and/or employees, was negligent in manners including but not limited to:

a) Failing to take proper and effective measures to ensure an incident such as the one described in this Complaint did not occur;

b) Failing to take protective measures to ensure the safety, security, and wellbeing of Plaintiff;

c) Permitting and/or allowing an environment in which Smith easily and repeatedly violated or engaged in conduct that would constitute violations of Minnesota criminal statutes prohibiting Sexual Abuse (§ 541.073), and/or Assault in the Fifth Degree (§ 609.224);

d) Failing to verify Smith's Salsa credentials;

e)  Failing to validate Smith's Salsa references.

341.   The acts or omissions by Defendant were a direct and proximate cause of the injuries and damages as set forth hereto.

342.   As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

## Count Six
### Negligent Retention - Common Law

343.   Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

344.   Defendant, through its agents and/or employees, was negligent in manners including but not limited to:

a)  Failing to take proper and effective measures to ensure an incident such as the one described in this Complaint did not occur;

b)  Failing to take protective measures to ensure the safety, security, and wellbeing of Plaintiff;

c)  Permitting and/or allowing an environment in which Smith easily and repeatedly violated or engaged in conduct that would constitute violations of Minnesota criminal statutes prohibiting Sexual Abuse (§ 541.073), and/or Assault in the Fifth Degree (§ 609.224);

d)  Failing to investigate Smith after Jane received a head injury during

Smith's class;

e)  Failing to investigate Smith after receiving Professor Howard's concerns.

345.    The acts or omissions by Defendant were a direct and proximate cause of the injuries and damages as set forth hereto.

346.    As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

## Count Seven
### Negligent Supervision - Common Law

347.    Plaintiff realleges and incorporates by reference each allegation contained in this Complaint as if fully restated herein.

348.    Defendant, through its agents and/or employees, was negligent in manners including but not limited to:

a)  Failing to take proper and effective measures to ensure an incident such as the one described in this Complaint did not occur;

b)  Failing to take protective measures to ensure the safety, security, and wellbeing of Plaintiff;

c)  Permitting and/or allowing an environment in which Smith easily and repeatedly violated or engaged in conduct that would constitute violations

of Minnesota criminal statutes prohibiting Sexual Abuse (§ 541.073),

and/or Assault in the Fifth Degree (§ 609.224);

d)  Failing to observe Smith's class;

e)  Failing to supervise Smith during Jane's independent study.

349.   The acts or omissions by Defendant were a direct and proximate cause of the injuries and damages as set forth hereto.

350.   As a result of Defendant's unlawful conduct, Plaintiff suffered damages in the form of increased financial hardship, loss of career opportunities, physical injury, severe emotional trauma and psychological distress, diminished enjoyment of life, depression, anxiety, humiliation, pain in mind and body, and past and future medical expenses.

**Plaintiff demands a trial by jury for issues of fact herein.**

## Prayer for Relief

Wherefore, Plaintiff Jane Doe prays for judgment against Defendant as follows:

1.   As to Count One, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

2.   As to Count Two, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

3.      As to Count Three, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

4.      As to Count Four, a judgment in her favor in an amount in to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

5.      As to Count Five, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

6.      As to Count Six, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

7.      As to Count Seven, a judgment in her favor in an amount to be determined by a jury, together with costs and disbursements herein, attorney fees, punitive damages, pre-and-post-judgment interest, and all other relief the Court deems just and equitable.

Dated: June 17, 2024

**THE LAW FIRM OF TAMARA N. HOLDER**          **STORMS DWORAK**

/s/ Tamara N. Holder                          /s/ Paul C. Dworak
Tamara N. Holder, #41895                      Paul C. Dworak, #391070
(*pro hac vice pending*)                      Naomi E. H. Martin, #0402332
Alexis Pavlatos, #6330270                     222 South 9th Street, Suite 470
(*pro hac vice pending*)                      Minneapolis, MN 55402
917 West Washington Blvd., Suite 222          Phone: 612.455.7056
Chicago, IL 60607                             Fax: 612.455.7051
Phone: 312.440.9000                           paul@stormsdworak.com
tamara@tamaraholder.com                       naomi@stormsdworak.com
alexis@tamaraholder.com

*Attorneys for Plaintiff*