## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jane Doe, | Civil No. 0:24-cv-2300 (DWF/DLM) |
| Plaintiff, | |
| vs. | **DEFENDANT CARLETON COLLEGE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS** |
| Carleton College, | |
| Defendant. | |

## <u>INTRODUCTION</u>

What happened to Jane Doe at the hands of Smith was awful, and something Carleton College would never want any of its students to experience. But there is no question that once Doe identified Smith and reported his deplorable misconduct, Carleton took swift and effective steps to protect Doe, stop Smith from making any further contact with Doe, and support Doe academically. All of this is evident on the face of the Complaint.

Indeed, on the day Smith was terminated, Doe delivered a handwritten note to Carleton's Title IX Coordinator that read:

> I cannot thank you enough for everything you've done . . . . You are so trustworthy, so honestly dedicated to (and extremely effective at) helping people, and such an obviously wonderful person that I could finally feel the weight lift. I've really appreciated and needed all the patience, understanding, validation and empowerment . . . and am endlessly grateful to you.

Doe's feelings have evidently changed, and she has decided to sue only Carleton, rather than the perpetrator Smith. But the unfortunate reality is that predators usually operate underneath the surface of our society and its institutions, not in plain sight. The law is clear

that an institution is liable for the bad acts of an employee only where the harm was foreseeable and occurred within the course and scope of employment. And an institution may be directly liable only when it knowingly hires or continues to employ a dangerous person or fails to adequately respond after learning of harm.

None of this is alleged in Doe's Complaint. The allegations show: (1) Carleton had no information suggesting Smith posed a danger when he was hired or until Doe fully disclosed his misconduct; (2) Smith's unusual and repulsive behavior was not foreseeable—either individually or in the industry; and (3) once Doe identified Smith and reported his misconduct, the College took immediate and effective steps to address it— Smith's employment was terminated, security measures were implemented, and Doe was never contacted by Smith again. Carleton provided academic adjustments that enabled Doe to graduate on time and with a strong grade point average in a challenging major.

Carleton deeply regrets what happened to Doe. But by seeking to hold Carleton responsible for Smith's wrongdoing, she must allege facts—not labels and conclusions— stating plausible legal claims against the College. Because the Complaint fails to state any claim against Carleton, this action should be dismissed.

## DOE'S ALLEGATIONS[1]

### I.    Parties

Carleton is a liberal arts college in Northfield, Minnesota with approximately

2,000 students. (*See* Compl. ¶¶ 13, 15). Carleton has three terms per academic year: fall,

winter, and spring. (*See* Sommermeyer Decl. Ex. 1).[2] The College prohibits all forms of

sexual misconduct, including sexual harassment and violence. (*Id.* at Ex. 2). Doe attended

Carleton from 2019 until she graduated in 2023. (*Id.* at Ex. 1; Compl. ¶ 20).

### II.    Doe's early relationship with Smith

Doe enrolled at Carleton at 18 years old with an extensive background in dance.

(Compl. ¶¶ 19, 22). In her first term, Doe participated in a salsa dance workshop taught by

Smith. (*Id*. ¶¶ 20-21). Doe then enrolled in an elective salsa course taught by Smith the

following term. (*Id*. ¶¶ 24, 26).

Smith praised Doe's dance abilities and "singled [her] out" for attention. (*Id*. ¶¶ 27-

29). Doe attended group dinners at Smith's home and accompanied Smith on walks. (*Id*.

¶ 30). Doe shared her financial difficulties with Smith, who directed her to an assistance

---

[1] For purposes of this motion only, Carleton treats the well-pleaded allegations in Doe's Complaint as true. *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007). The assumption of truth does not extend to conclusory allegations or legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] On a motion to dismiss, the Court may consider materials that are necessarily embraced by the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The documents referenced in and necessarily embraced by the Complaint are attached as exhibits to the Declaration of Sean Sommermeyer ("Sommermeyer Decl."), which includes citations to the paragraphs of the Complaint in which the documents are referenced, quoted, or described.

program and paid the cost of one of her textbooks. (*Id*. ¶¶ 31-35). At this point, Doe was "grateful for [Smith's] assistance and generosity." (*Id*. ¶ 36).

At the beginning of her sophomore year, Doe accepted invitations from Smith for private dance instruction. (*Id*. ¶¶ 41-44). Doe participated in "at least ten" private practices in Smith's office. (*Id*. ¶ 44). Doe believed Smith was a "mentor and an expert" and neither felt nor reported any concerns about Smith to the College. (*Id*. ¶¶ 46, 49).

### III.    Smith's escalating behavior

At the outset of her junior year, Smith offered Doe a position as co-instructor for his Salsa I course. (*Id*. ¶¶ 52-54). Doe accepted. (*Id*. ¶ 54). Doe also enrolled in an intermediate salsa class taught by Smith. (*Id*. ¶ 55).

During the fall term, Smith began sharing inappropriate and disturbing information with Doe. (*Id*. ¶¶ 57-62). This included comments about his marriage, sexual partners outside of his marriage, and sexual behavior as well as claims by Smith that he was "highly trained in mixed martial arts," a "knife fighter," had "nearly beat[en]" someone to death "with a tennis racket," was a "diagnosed sociopath" and "taught live classes on sexual domination." (*Id*. ¶¶ 57-62). Smith told Doe that he "always had at least one knife on his person" and owned two guns. (*Id*. ¶ 62). Doe does not allege she reported any of this to Carleton at the time.

Although Doe "began to fear" Smith, she sought to ignore his behavior and focus her attention elsewhere. (*Id*. ¶¶ 63-65). Doe alleges Smith began requiring her to prepare for class and practice at his home on weekends. (*Id*. ¶¶ 66-67). However, Doe believed "her

presence in his home was innocuous" in part because Smith's wife was often present. (*Id.* ¶ 69).

After fall term ended and her dorm closed, Doe accepted an offer to stay overnight at Smith's home. (*Id.* ¶¶ 81-83). Doe alleges Smith provided her alcohol, pressured her to drink and play "Truth or Dare," and made sexual comments. (*Id.* ¶¶ 84-90). She awoke the next day with red marks around her throat and no recollection of how they occurred. (*Id.* ¶¶ 93, 95-96).

Doe confronted Smith who "swore her to secrecy," but continued to make sexual comments and pressed her for a sexual relationship. (*Id.* ¶¶ 97-101). At this point in their relationship, Doe does not allege she reported any of Smith's actions to Carleton. (*See id.* ¶¶ 124-128, 182-185).

At the beginning of winter term, Doe sought to establish boundaries with Smith but his advances continued. (*Id.* ¶¶ 107-109). This included kissing Doe's back while giving her a massage, asking her to kiss him, and leaving a bouquet of flowers in Doe's student mailbox. (*Id.* ¶¶ 107, 113-121).

In late-January 2022, Doe agreed to go to Smith's house on her birthday to pick up a gift. (*Id.* ¶¶ 129-133). Smith concocted a game wherein Doe selected a piece of paper that read "20 hits by hand" and Smith proceeded to "aggressively spank Jane on the buttocks over her jeans." (*Id.* ¶¶ 134-140). Doe and Smith began dancing, Smith bit Doe on her shoulder and ear, pinned her against the kitchen island, and put a hand around her throat. (*Id.* ¶¶ 149-159).

**IV.     Doe makes an initial report to Carleton but does not identify Smith**

Doe confided the incident to a friend and saw a therapist to address her mental health. (*Id*. ¶¶ 164, 168, 171). Doe authorized her therapist to notify Carleton Dean Trey Williams that she "needed certain accommodation[s] to keep up with her studies." (*Id*. ¶ 172). There is no allegation that Dean Williams was informed of any misconduct Doe was experiencing or the identity of its perpetrator. (*See id.*)

Meanwhile, Smith attempted to apologize to Doe and "begged for [her] forgiveness," blaming his behavior on his wife's health issues. (*Id*. ¶¶ 173-178). Doe continued to attempt to manage the situation with Smith on her own. (*Id.* ¶¶ 179-180). However, as her mental health and grades worsened, Doe alleges that on February 13, 2022, she informed Dean Williams that "she had been assaulted by a Carleton staff member at his home" and needed help obtaining academic accommodations like extensions and excused absences. (*Id*. ¶¶ 181-182). Doe specifically chose not to share that Smith was her attacker because she knew Dean Williams "was mandated to report what she would tell him." (*Id*. ¶ 183; *see also* Sommermeyer Decl. Ex. 2 at p. 8).

Dean Williams filed a Community Concern Form about his meeting with Doe. (Sommermeyer Decl. Ex. 3). He sought to question Doe about the attack, "but it was clear she was not ready to discuss any details." (*Id.*) Dean Williams knew Doe was receiving support from an outside counselor and advised her to preserve all communications with the perpetrator "for when she is ready to move forward." (*Id.*)

Doe alleges Dean Willaims told her she was responsible for meeting with professors to arrange accommodations and that she did so. (Compl. ¶¶ 186-187). Nonetheless, Doe alleges her academic performance suffered and she fell behind on credits. (*Id*. ¶ 188).[3]

## V.    A faculty member reports potential concerns about "excessive closeness" in a dance performance

In spring term 2022, Doe enrolled in Salsa II with Smith as a credit-earning student and co-instructor. (*Id*. ¶ 191). In addition, Smith approached the Chair of the Theater and Dance Department, Judith Howard, to propose an independent study wherein Smith would teach one-on-one Latin dance to Doe. (*Id*. ¶¶ 192-193).

In connection with the proposal, Doe and Smith performed for Prof. Howard. (*Id*. ¶¶ 192, 195, 197). Following the performance, Prof. Howard sent an email to Carleton's Title IX Coordinator, Laura Riehle-Merrill, requesting a meeting. (*Id*. ¶¶ 198-199; Somermeyer Decl. Ex. 4). Prof. Howard told Riehle-Merrill there was "nothing drastic occurring" but that she was aware of a situation that raised questions "about boundaries between students and teachers" which "may or may not merit concern." (Somermeyer Decl. Ex. 4).

Doe alleges that, in their subsequent meeting, Prof. Howard told Riehle-Merrill she had observed "excessive closeness" during the performance and "expressed reservations" about the independent study, including about Doe being "exploited." (Compl. ¶¶ 200-202).

---

[3] Doe alleges she failed a class in winter term 2022, but this is not reflected in her transcript. *Compare* Compl. ¶ 188 *with* Somermeyer Decl. Ex. 1.

Doe claims Riehle-Merrill "did not investigate" the concerns. (*Id*. ¶ 204). According to Doe, Riehle-Merrill advised Prof. Howard to take steps to "define boundaries" between Smith and Doe. (*Id*. ¶ 206). There is no allegation that Doe reported any concerns related to the independent study. (*See id.*)

Doe alleges Smith's misconduct continued during the independent study and Salsa II course, including sexual comments, spanking, grabbing, and forced kissing. (*Id*. ¶¶ 218-229). Doe did not report any of Smith's behavior at this time. (*See id.* ¶ 230).

During spring term, Doe was placed on academic probation which required her to take and pass her courses with a C- or better and carry a term GPA of at least 2.0. (*Id*. ¶ 208; Somermeyer Decl. Ex. 5). Doe was informed that academic probation was not a punishment, but an effort to set goals and develop plans for academic success. (Somermeyer Decl. Ex. 5)*.* Doe was also advised that she could transfer up to six credits to Carleton to address any credit deficiency. (*Id.*)

## VI.    Doe reports experiencing sexual assault and subsequently identifies Smith as the perpetrator

On April 18, 2022, Doe's friend met with Riehle-Merrill. (Compl. ¶ 231). The friend "spoke in hypotheticals" to get information "on the process for reporting a staff member." (*Id*. ¶¶ 231-232). Four days later, Doe reported to Dean Cathy Carlson "that she had been sexually assaulted." (*Id*. ¶ 234). Dean Carlson told Doe the College would waive her academic probation and that she should email Dean Carolyn Livingston to provide information about her extenuating circumstances. (*Id*. ¶¶ 235-236). Doe did not respond to

Dean Livingston's request for a written explanation, and claims that Dean Livingston did not respond to her request for an in-person meeting. (*Id*. ¶¶ 237-241).

On May 9, 2022, Doe met with Riehle-Merrill in person and reported Smith's harassment and assaults. (*Id*. ¶ 247).[4] Riehle-Merrill took a detailed report of Smith's misconduct and told Doe that Smith could be "fired quickly." (*Id*. ¶¶ 248-251). Riehle-Merrill relayed the information to Carleton's Title IX Deputy for Faculty and Staff and risk manager. (*Id*. ¶ 254). Riehle-Merrill contacted a nonprofit advocacy center to assist Doe with filing a Harassment Restraining Order ("HRO") against Smith. (*Id*. ¶ 256).[5]

## VII.  Smith's employment is immediately terminated and he is barred from campus and contacting students

Within days of Doe identifying Smith, his employment with Carleton was terminated and his presence on College property was prohibited. (*Id*. ¶ 261). Carleton Security advised Doe that: (1) Smith was barred from campus and if he came to campus he would be removed by security; (2) Smith was prohibited from having contact with any Carleton students; and (3) Smith's ban from campus could be renewed in twelve months. (*Id*. ¶ 270). Critically, there is no allegation that Doe had any contact whatsoever with Smith after Carleton terminated his employment and implemented security measures.

---

[4] Doe's Complaint states that she "*again* reported Smith's harassment and assaults." (*Id*. ¶ 247) (emphasis added). While Doe alleges that she had previously reported that she had experienced misconduct, there is no allegation that Doe identified Smith as the perpetrator to anyone at Carleton prior to the May 9, 2022 meeting with Riehle-Merrill. (*See id*. ¶¶ 182-183, 231-232, 234).

[5] After Doe's initial HRO petition was denied, Riehle-Merrill helped Doe find assistance from an attorney. (*Id*. ¶¶ 260, 264).

## VIII.   Doe graduates from Carleton

After Smith's employment was terminated, the remainder of Salsa II was cancelled. (*Id*. ¶ 272). Doe and other students in the course received full credit. (*See id*.; Sommermeyer Decl. Ex. 1). At the end of spring term 2022, Doe was removed from academic review. (Compl. ¶ 284).

Doe successfully petitioned the Academic Standing Committee to take additional coursework over the summer after she dropped a course during spring term 2022. (*Id*. ¶¶ 278-282). Doe alleges Carleton did not help her find or pay for summer courses, but she earned 24 credits over the summer to compensate for courses she had dropped in previous terms. (*Id*. ¶¶ 282-283, 290, 293-295). Doe completed her senior year at Carleton without incident and graduated from the College in four years with a major in psychology and a 3.02 grade point average. (*See* Sommermeyer Decl. Ex. 1).

## IX.   Doe's Complaint

In her Complaint, Doe alleges that Carleton: (1) responded to her report of Smith's misconduct with "deliberate indifference" in violation of Title IX (Compl. ¶¶ 299-307); (2) is vicariously liable for Smith's assault, battery, and sexual abuse (*Id*. ¶¶ 310-315, ¶¶ 325-338); (3) is vicariously liable for Smith's "bias offense" under Minn. Stat. § 611A.79; and (4) was negligent in hiring (*Id*. ¶¶ 339-342), retaining (*Id*. ¶¶ 343-346); and supervising Smith (*Id*. ¶¶ 347-350).[6]

---

[6] Doe states she "bring[s] this action against Smith" (Compl. ¶ 5) but did not name him as a defendant. Carleton is not aware of Doe asserting any legal claims directly against Smith in this or any other forum.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim to relief requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In assessing plausibility, courts must draw on "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Relevant here, "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" do not state a claim. *Id.* at 678.

## ARGUMENT

### A.    Doe fails to state a Title IX claim

#### 1.    Legal standards

The Supreme Court has set a "very high bar" to hold an institution liable under Title IX for its response to sexual misconduct. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998). A plaintiff must show: (1) the school had "actual knowledge" of the sexual harassment; (2) it was "deliberately indifferent" to it; and (3) the institution's deliberate indifference "'caused students to undergo harassment' or 'made them liable or vulnerable to it.'" *Davis ex. rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021).

Deliberate indifference means "an official decision by the [institution] not to remedy the violation." *Gebser*, 524 U.S. at 290; *see also Kinman v. Omaha Pub. Sch.*

*Dist.*, 171 F.3d 607, 610 (8th Cir. 1999) (dismissing Title IX claim because school officials "did not turn a blind eye and do nothing"). An institution's response is judged on "the information it had at the time in question." *Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014). And it must respond to known acts of sexual harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-49.

Because an institution can be liable only in these "limited circumstances," the Supreme Court has made clear "there is no reason why courts, on a motion to dismiss . . . could not identify a response as 'not clearly unreasonable' as a matter of law." *Id.* at 649.[7]

### 2.    Doe has not plausibly alleged deliberate indifference

The allegations in Doe's Complaint show that Carleton's response to her report of sexual misconduct far exceeded deliberate indifference. Once it had actual knowledge of Smith's harassment and assaults, Carleton responded by:

- Terminating Smith's employment (Compl. ¶ 261);

- Banning Smith from campus (*Id.*);

- Banning Smith from contacting Doe or any other student (*Id.* ¶ 270);

- Implementing safety and security measures (*Id.* ¶¶ 269-270);

- Connecting Doe with a nonprofit advocacy center for guidance in obtaining an HRO (*Id.* ¶¶ 253, 256);

- Arranging outside legal assistance for Doe (*Id.* ¶ 264);

---

[7] Under Title IX, an institution may only be held liable for its own misconduct. *Id.* at 633. It "cannot be held vicariously liable for the misconduct of others." *Shank v. Carleton Coll.*, 232 F.Supp.3d 1100, 1108 (D. Minn. 2017) (citing *Davis*, 526 U.S. at 640-41).

- Cancelling Smith's salsa course and providing Doe full credit (*Id*. ¶ 272);

- Approving Doe's petition to increase the number of credits she was allowed to earn over the summer (*Id*. ¶¶ 281-82); and

- Removing Doe from academic review (*Id*. ¶ 297).

These allegations establish that Carleton's response was the opposite of "an official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 290. They show Carleton acted quickly and effectively in stopping Smith's misconduct, preventing any further contact from Smith, and assisting Doe in completing her education.

None of the deficiencies Doe alleges regarding Carleton's response come close to deliberate indifference. First, Doe appears to suggest that Carleton should have taken action before she identified Smith and reported his misconduct. But under Title IX, a school's obligation to respond is triggered by "actual knowledge" of sexual harassment. *See Shank*, 232 F.Supp.3d 1100, 1109 (citing *Davis*, 526 U.S. at 633; *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003)). Actual knowledge "requires schools to have more than after-the-fact notice of a single instance in which the plaintiff experienced sexual [discrimination]" and is established where the school has "*prior knowledge* of (1) harassment previously committed by the same perpetrator and/or (2) previous reports of sexual harassment occurring on the same premises." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) (emphasis in original).[8]

---

[8] The Supreme Court clearly rejected a theory of constructive notice liability under Title IX. *Gebser*, 524 U.S. at 288-90.

Prior to May 9, 2022, when the Complaint states that Doe identified Smith and reported his "history of harassment and assaults" (Compl. ¶¶ 247-50), it alleges only that:

- Doe told Dean Williams she needed academic accommodations following an "assault" at the home of a staff member (*Id*. ¶¶ 172, 182);

- Prof. Howard observed "excessive closeness" between Doe and Smith during a salsa dance performance which "may or may not merit concern" (*Id*. ¶¶ 198-200); and

- Doe told Dean Carlson she had been "sexually assaulted." (*Id*. ¶ 234).

These allegations, taken alone or together, do not show that Carleton had actual knowledge of Smith's sexual harassment of Doe. *See KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 598 (8th Cir. 2021) (describing the actual notice standard as "quite onerous"); *Ostrander*, 341 F.3d at 751 (sexual harassment by other fraternity members on other premises did not satisfy "known acts" requirement).

In her report to Dean Williams, Doe made the deliberate decision not to identify Smith and reported only that she had been physically attacked. *See Shank*, 232 F.Supp.3d at 1109 ("[A] funding recipient must have actual knowledge of *sexual assaults* and be deliberately indifferent to those *sexual assaults*") (emphasis in original). There is no allegation that Professor Howard observed—let alone reported—sexual harassment or assault. *See KD*, 1 F.4th at 598 ("vague complaints about the teacher's behavior toward the student" did not provide actual notice because they did not "*expressly* allege sexual abuse of the student") (emphasis in original). And when Doe told Dean Carlson in late-April 2022 that she had been sexually assaulted, she did not identify Smith. *See K.T.*, 865

14

F.3d at 1058 (affirming dismissal based on lack of actual notice where plaintiff could not allege college knew of any prior allegations of sexual assault by the same perpetrator).

Yet in each instance, the Complaint shows Carleton responded in a manner that was "not clearly unreasonable" given the information presented. *Davis*, 526 U.S. at 633. Dean Williams verified that Doe was receiving support from a therapist and advised her to preserve communications for a future complaint. (Compl. ¶ 172; Sommermeyer Decl. Ex. 3). He sought additional information from Doe, but "it was clear she was not ready to discuss any details." (Sommermeyer Decl. Ex. 3). In response to concerns about "closeness" during a dance performance preceding an independent study, Riehle-Merrill advised Prof. Howard to take steps to "define boundaries" between teacher and student. (Compl. ¶¶ 200, 206). Dean Carlson waived Doe's academic probation and provided information on further support. (*Id*. ¶¶ 235-236). And, approximately two weeks later when Doe identified Smith, he was immediately terminated. (*Id*. ¶ 261).

Second, Doe's allegations of certain deficiencies in Carleton's response do not come close to pleading deliberate indifference. For instance, Doe claims that Riehle-Merrill was "slopp[y]" in assisting with her HRO (*Id*. ¶¶ 257, 260, 266), that Carleton left Doe to "field questions" about the cancellation of the salsa course (*Id*. ¶¶ 273-275), did not provide certain help "finding and funding summer courses" (*Id*. ¶¶ 280-283), and that certain administrators were not communicative. (*Id*. ¶¶ 285-289).

None of this amounts to deliberate indifference. The Supreme Court has made clear that Title IX is not a vehicle for plaintiffs to challenge the "reasonable[ness]" of the decisions or actions of school administrators. *Maher v. Iowa State Univ.*, 915 F.3d 1210,

1213 (8th Cir. 2019); *see also Kollaritsch v. Mich. St. Univ. Bd. Of Trustees*, 298

F.Supp.3d 1089, 1100 (W.D. Mich. 2017) (allegations of "sloppy, or even reckless

oversights" do not establish deliberate indifference) (citing *Doe v. Claiborne Cnty.*, 103

F.3d 495, 508 (6th Cir. 1996)). Nor does Title IX provide means for a plaintiff "to make

particular remedial demands." *See Davis*, 526 U.S. at 648.

Doe's dissatisfaction with certain aspects of the assistance and support she

received "does not mean the school's response can be characterized as deliberate

indifference." *Maher*, 915 F.3d at 1213. Indeed, her allegations boil down to claims that

Carleton could have "gone even further or done more to assist" which is "far from

exhibiting deliberate indifference." *Jenkins v. Univ. of Minn.*, 131 F.Supp.3d 860, 887 (D.

Minn. 2015).

Courts routinely dismiss Title IX claims at the pleading stage where, as here, the

Complaint establishes that a school did not turn a blind eye to sexual harassment and took

measures to address it. *E.g.*, *KF v. Monroe Woodbury Cent. Sch. Dist.*, 531 Fed. Appx.

132, 134 (2d Cir. 2013) (finding no deliberate indifference where school responded

following report of abuse but did not provide remedy sought by parents); *Facchetti v.

Bridgewater Coll.*, 175 F.Supp.3d 627, 637-38 (W.D. Va. 2016) (allegations that college

failed to follow its procedures and imposed insufficient discipline on assailant did not

plead deliberate indifference where college "interviewed [the assailant], held a hearing,

and took disciplinary action."); *Nance v. Rowan-Salisbury Bd. Of Ed.*, 1:17-cv-957, 2019

WL 1437212, at *5 (M.D. N.C. Feb. 27, 2019) (dismissing deliberate indifference claim

where school required apology from student, held meetings with school officials, and

suspended student following complaints of harassment, but "may not have taken the remedial measures that Plaintiff[] wanted."); *Moore v. Regents of the Univ. of Calif.*, 15-cv-05779, 2016 WL 2961984, at *6-7 (N.D. Cal. May 23, 2016) (allegations that university discouraged plaintiff from filing a complaint, suggested she withdraw, and allowed assailant to remain on campus unrestricted did not show deliberate indifference where it took other actions to respond to her report). Doe's present dissatisfaction with Carleton's response does not clear the "very high bar" to allege deliberate indifference. *Shank*, 232 F.Supp.3d at 1109.

> 3. <u>There are no allegations that Carleton's response caused or made Doe vulnerable to further harassment</u>

Doe's Title IX claim fails for the additional reason that there is no allegation that Carleton's response caused or made Doe vulnerable to further harassment. *Davis*, 526 U.S. at 645; *Shank*, 990 F.3d at 573. Once Doe identified Smith and reported his history of misconduct, he was immediately terminated and barred from coming to campus or contacting students. (Compl. ¶¶ 261, 270). There is no claim that Doe was ever again contacted by Smith, let alone that Carleton's response caused Doe to experience further harassment or made her vulnerable to it. *See e.g.*, *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001) ("[D]eliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse[.]"); *K.T.*, 865 F.3d. at 1058 (dismissing Title IX claim where allegations that college failed to investigate and offer medical services did not show deliberate indifference that caused or made plaintiff vulnerable to sexual

assault).[9] That the Complaint makes clear Carleton's response effectively prevented further harassment from Smith is independently fatal to Doe's Title IX claim.

There is no justification for Smith's misconduct. "[B]ut this is simply not a case where a school ignored her plight or made no effort whatsoever to prevent future harassment." *Doe v. Dist. of Columbia, et al.*, 694 F.Supp.3d 20, 35-36 (D.D.C. 2023). To the contrary, the facts alleged show Carleton took swift and unequivocal measures to protect Doe in response to her report. As a result, Doe fails to state a claim of deliberate indifference under Title IX.[10]

**B.    Doe fails to plausibly allege that Smith's intentional torts or "bias offense" occurred within the course and scope of his employment**

Doe seeks to hold Carleton liable for the intentional torts of Smith and his alleged commission of a "bias offense" based on conclusory allegations that they were committed "in the course and scope of [Smith's] employment." (*See* Compl. ¶¶ 313-15, 318-24, 335-37). However, the claim that Smith's deplorable conduct was foreseeable or somehow part of a college instructor's job has no support in the facts alleged or applicable law.

Under Minnesota law, an employer may be "vicariously liable for the torts of an employee committed within the course and scope of employment." *Fahrendorff ex rel.*

---

[9] Allegations that Doe experienced emotional harm following Smith's misconduct are not sufficient. *Davis*, 526 U.S. at 644-45.

[10] Doe alleges Carleton "never reported Smith's conduct pursuant to the Clery Act." Clery Act reports are publicly available and are prohibited from identifying victims or accused persons. *See* 34 C.F.R. § 668.46(c)(7). In any event, there is no private right of action under the Clery Act. *See King v. San Francisco Cmty. Coll. Dist.*, No. C 10-01979, 2010 WL 3930982, at *4-5 (N.D. Cal. Oct. 6, 2010).

*Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999). The plaintiff has the burden to show an employee's actions were within the course and scope. *See Hartford Fire Ins. Co. v. Clark*, 727 F.Supp.2d 765, 771 (D. Minn. 2010).

For intentional torts, an employer may be vicariously liable only if "(1) the tort is related to the employee's duties; and (2) the tort occurs within work related limits of time and place." *Id.*, 727 F.Supp.2d at 770 (quoting *Hagen v. Burmeister & Assocs.*, 633 N.W.2d 497, 504 (Minn. 2001). "The critical inquiry to determine if the source of the harm is related to the duties of the employee is whether the employee's acts were foreseeable." *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 47 (Minn. Ct. App. 2009).

Foreseeability is shown where "the type of tortious conduct involved is a well-known industry hazard." *Hagen*, 633 N.W.2d at 505. That is because vicarious liability stems "not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business." *Fahrendorff*, 597 N.W. 2d at 910.

Employee misconduct that is so "unusual or startling" in the context of the employer's business is not subject to vicarious liability. *Id.* at 912. Courts in this District dismiss vicarious liability claims on a Fed. R. Civ. P. 12(b)(6) motion where a complaint fails to plead facts plausibly alleging foreseeability or the other elements required for vicarious liability. *E.g.*, *Miles v. Simmons Univ.*, 514 F.Supp.3d. 1070, 1075 (D. Minn. 2021); *Davis v. Dollar Tree, Inc.*, No. 18-cv-1118, 2019 WL 174911, at *2-3 (D. Minn. Jan 11, 2019).

Smith's misconduct was unquestionably unusual and startling. The Complaint describes a campaign of psychological manipulation by Smith (Compl. ¶¶ 27, 28, 45, 47, 48, 72, 73, 84, 98, 105, 106, 108, 112, 176, 177, 178), sometimes with his wife present to "subdu[e] any … concerns that Smith had ill-intentions" (*Id.* ¶¶ 49, 69), that was often sexualized (*Id.* ¶¶ 59, 61, 79, 90, 100, 101, 103, 107, 119), included predispositions of violence (*Id.* ¶¶ 58, 62) and culminated in incidents of spanking (*Id.* ¶ 140), biting (*Id.* ¶¶ 149, 152), choking (*Id.* ¶¶ 95, 159) and sexual proposition (*Id.* ¶¶ 99, 114, 120).

Allegations like this of extreme and unusual misconduct far outside the norm of employee behavior have been dismissed at the pleading stage for lack of foreseeability. *E.g.*, *Miles*, 514 F.Supp.3d at 1076-77 (dismissing claims of vicarious liability for conduct of professor alleged to have posted video of student using the bathroom to social media); *Dollar Tree*, 2019 WL 174911, at *1-2 (dismissing claims of vicarious liability for conduct of employee who engaged in a fight with a third-party while on the job who later returned to the store and shot the plaintiff); *see also Grozdanich v. Leisure Hills Health Ctr.*, 25 F.Supp.2d 953, 979 (D. Minn. 1998) ("Naturally, the more outrageous the employee's tortious act should be, the less likely it could be described as foreseeable, and the less likely that the employer could be required to assume responsibility for the act, as a general risk of the employer's business.")

Critically, the Complaint contains no factual allegations that the behavior engaged in by Smith is a "well-known industry hazard" in dance instruction specifically or higher education generally. *Hagen*, 633 N.W.2d at 505. At most, it states, without support, that college-age women are "particularly susceptible to grooming" (Compl. ¶ 1) and that

sexual assault of a student by an instructor "is a well-known hazard in the dance and education industries." (*Id*. ¶ 336).

The first allegation says nothing about foreseeability, let alone known industry hazards, and the second is a conclusory statement with no factual allegations to support it. *See Iqbal*, 556 U.S. at 680-81; *P.L. v. Aubert*, 545 N.W.2d 666, 668 (Minn. 1996) (declining to hold that sexual relationships between teacher and student are a generally-known hazard).

The Complaint contains no facts plausibly showing that Smith's misconduct was foreseeable to the College. *See Miles*, 514 F.Supp.3d at 1076. Indeed, "the Complaint never mentions [the foreseeability] requirement explicitly" and "neither uses the word 'foreseeable' nor any of its variants, and it does not otherwise seem to acknowledge this element of [Plaintiff's] claims against [Defendant]." *Id.* As in *Miles*, simply "stat[ing] multiple times in the Complaint that [employee] acted within the scope of his employment" is conclusory and insufficient. *Id.*; *see also Fahrendorff*, 597 N.W.2d at 911-12 (describing statement from expert that "sexual contact or abuse of power . . . is a well known hazard in this field" as "conclusory and lacking specific[s]").[11] Accordingly, Doe's vicarious liability claims fail.

---

[11] Although foreseeability in the vicarious liability context is assessed at the industry or enterprise level, courts have also looked to whether the individual employee had a record of similar past misconduct. *See Miles*, 514 F.Supp.3d at 1077 (noting lack of allegations that professor "had demonstrated a tendency toward this kind of behavior"). As discussed in Section D(3), below, the Complaint also lacks any allegations of similar past misconduct by Smith.

**C.    Doe's "bias offense" claim fails because she does not plausibly allege Smith was motivated by her gender or national origin**

Doe's "bias offense" claim also fails because the Complaint contains no plausible allegations that Smith's misconduct was motivated by animus toward her gender or national origin. Minn. Stat. § 611A.79 provides a civil cause of action for a person "damaged by a bias offense." Minn. Stat. § 611A.79, subd. 2. "Bias offense" is defined as:

> [C]onduct that would constitute a crime and was committed *because of* the victim's . . . actual or perceived race, color, religion, sex, sexual orientation, disability . . . age or national origin.

*Id.* at subd. 1 (emphasis added). To state a claim, Doe must allege facts showing Smith "was acting out of animosity toward" Doe "because of" her gender or Indian national origin. *See Hillesheim v. Casey's Retail Co.*, 16-CV-0061, 2016 WL 3676164 at *4 (D. Minn. July 6, 2016) (interpreting "because of" in Minn. Stat. § 611A.79 as requiring plaintiff to plead facts showing perpetrator acted out of animus toward victim's protected characteristics).

Nowhere in 298 paragraphs of factual allegations is there any mention of Smith being motivated by animosity toward Doe's gender or national origin. (*See generally* Compl. ¶¶ 1-298). Only in its recital of Count III does the Complaint makes any reference whatsoever to these characteristics:

- "These violations [of Minnesota criminal law] were the result of Plaintiff's sex (female) and national origin (Indian)." (*Id.* ¶ 321).

- "Upon information and belief, Smith assaulted at least one other international female student of Southeast Asian descent." (*Id.* ¶ 322).

Neither of these statements plausibly alleges a bias offense. The first is a "[t]hreadbare recital[] of the elements of [the] cause of action" that the Court must disregard. *Iqbal*, 556 U.S. at 678-79; *see also Disability Support Alliance v. Monali, Inc.*, 15-cv-1522, 2016 WL 859442, at *12-13 (D. Minn. Feb. 12, 2016) (disregarding allegation that defendant "committed a bias offense against Plaintiffs" as a "formulaic recitation of the elements of a cause of action" and dismissing claim).

The second, offered "upon information and belief," does not plausibly allege a bias offense because it says nothing about Smith's state of mind, let alone animus against women or people from India. *See Disability Support Alliance v. Billman*, 15-CV-3642, 2016 WL 755620, at *8 (D. Minn. Feb. 25, 2016) (dismissing bias offense claim where "plaintiffs have pleaded no facts as to [perpetrator's] state of mind"); *Seivers v. City of Mpls.*, 09-CV-816, 2011 WL 284486, at *5 (D. Minn. Jan 25, 2011) (dismissing bias offense claim because officers' alleged use of term "gangbanger" during assault did not provide evidence that they acted with racial animus).

Committing a crime against a person with protected characteristics is not the same as committing a crime *because of* those protected characteristics.[12] And a "general awareness" of unrelated claims pled "upon information and belief" does not provide the "probative specificity" required to plead discriminatory animus. *See Ford. v. Delta Air*

---

[12] This Court has analogized Minn. Stat. § 611A.79 to the federal Hate Crime Law. *See Billman*, 2016 WL 755620, at *8. That law does not "seek to punish all violence against those who embody a [protected] trait" only "those who act '*because of* the [victim's] actual or perceived'" trait. *U.S. v. Hatch*, 722 F.3d 1193, 1206 (10th Cir. 2013) (emphasis added) (citing 18 U.S.C. § 249(a)(1)).

*Lines*, No. 18-3196, 2019 WL 2524772, at *3 (D. Minn. June 19, 2019); *see also*, *Jones v. Douglas Cnty. Sheriff's Dep't.*, 915 F.3d 498, 500 (8th Cir. 2019) (allegation "on information and belief" that an "open position was filled with a male candidate" failed to plausibly allege sex discrimination). Because there are no allegations that Smith acted "because of" Doe's gender or national origin, she fails to state a bias offense claim.[13]

### D.    Doe fails to state claims for negligent hiring, retention, or supervision

Doe also alleges the "triad" of negligence theories that frequently arise in cases like this: (1) negligent supervision; (2) negligent hiring; (3) negligent retention. *Cook v. Greyhound Lines, Inc.*, 847 F. Supp. 725, 733 (D. Minn. 1994). These claims are distinct from each other and have unique elements and pleading requirements, which Doe has not met.

As a threshold issue, negligent hiring and retention are direct liability theories concerning an employer's conduct in relation to acts by an employee that are *outside* the scope of his employment. *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. Ct. App. 1993). In contrast, negligent supervision is a vicarious liability claim, which focuses on an employee's wrongful conduct allegedly *within* his scope of employment. *Id.* Here, Doe's conclusory allegations—which she makes repeatedly—are that Smith was acting within

---

[13] In addition, the bias offense statute does not appear to provide a cause of action against an entity, only a natural person. *See* Minn. Stat. § 611A.79, subd. 2 (limiting the defendant in a civil cause of action to "*the person* who committed the offense.") (emphasis added). The statute contains no definition expanding "person" beyond natural persons. And while claims under Minn. Stat. § 611A.79 have been brought against entities, Carleton has found no case in which an entity has been found liable—either directly or vicariously—under the statute.

the scope of his employment at Carleton when he assaulted her. (*See e.g.*, Compl. ¶¶ 14, 315, 324, 337). Doe makes no allegations that Smith was acting outside the scope of his employment to support her triad of negligence theories. Consequently, Doe fails to state a claim for negligent hiring or negligent retention for this threshold reason. And all three of Doe's negligence claims fail for the additional reasons discussed below.

1.    <u>Doe alleges no facts showing Carleton knew or should have known Smith posed a danger at the time he was hired</u>

Negligent hiring occurs where "prior to the time the employee is actually hired, the employer knew or should have known of the employee's unfitness[.]" *Yunker*, 496 N.W.2d at 423. Allegations about an employee's conduct after he is hired and commences employment are insufficient because "in a negligent hiring claim, the duty is *owed and is breached at the time of hiring*, not at the time of the assault." *Hines v. Aandahl Constr. Co. LLC*, No. A05-1634, 2006 WL 2598031, at *2 (Minn. Ct. App. Sept. 12, 2006) (emphasis added).

Doe alleges no facts that, if true, would demonstrate Carleton knew or should have known of Smith's dangerous propensities at the time he was hired. Indeed, the Complaint contains no factual allegations at all concerning Smith's pre-employment conduct or background. At most, Doe alleges Carleton did not "verify Smith's Salsa credentials." (Compl. ¶ 340(d)). But allegations that Smith did not have "verified" credentials to teach salsa dancing do not come close to claiming Carleton knew or should have known of "dangerous propensities" at the time of hiring that "posed a threat of physical harm."

25

*McKenzie v. Lunds, Inc*., 63 F.Supp.2d 986, 1007 (D. Minn. 1999) (dismissing negligent hiring claim on Rule 12(b)(6) motion).

Further, Doe alleges no facts that, had they been uncovered by Carleton prior to Smith's hiring, would have caused Carleton to conclude that Smith was unfit to teach salsa, let alone a risk of sexually assaulting a Carleton student. Negligent hiring claims fail where, as here, the plaintiff alleges no facts that, had they been known at the time of an employee's hiring, would have led a reasonable person to conclude that the employee was unfit for the position. *See id.* at 1007 (dismissing negligent hiring claim where plaintiff did not allege any known dangerous propensities that posed a threat of physical harm to the plaintiff at the time of hiring); *L.M. ex. rel. S.M. v. Karlson*, 646 N.W.2d 537, 544 (Minn. Ct. App. 2002) (dismissing negligent hiring claim where even if employer had performed a background check at the time of hire, employee would not have been disqualified).

2.    The allegations in the Complaint show Carleton did not "retain" Smith after learning he posed a danger

Negligent retention is similar to negligent hiring, with the primary difference being the timing of when an employer knew or should have known that a particular employee posed a threat. Negligent retention claims can arise where an employer "retain[s] employees with known dangerous proclivities." *Yunker*, 496 N.W.2d at 423. This occurs when an employer becomes aware of an employee's possible dangerous proclivities after he has already been hired but "fails to take further action such as investigating, discharge, or reassignment." *Id.* (reversing summary judgment on negligent retention claim where

employer took no action after employee had sexually harassed female employees, challenged a coworker to a fight, and made outbursts and death threats).

Here, there are no allegations that Carleton was aware of Smith's "known dangerous proclivities" before Doe disclosed his history of harassment and assault on May 9, 2022. And once she made this disclosure, Doe admits that Smith's employment was immediately terminated and he was banned from campus and contact with Doe or any other student. (Compl. ¶¶ 261, 270). There are no allegations that Smith was "retained" by the College after it learned of his misconduct or that the College otherwise "fail[ed] to take further action." *Yunker*, 496 N.W.2d at 423. Therefore, Doe has failed to state a claim for negligent retention.

3. <u>Doe's negligent supervision claim fails because there are no allegations that it was foreseeable Smith would engage in misconduct</u>

To state a claim for negligent supervision, Doe must plausibly allege the existence of a duty of care, breach of that duty, proximate causation, and injury. *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007). Unlike negligent hiring and retention, which are direct liability claims, negligent supervision is a vicarious liability theory, which means that Smith's wrongful acts must have been within the course and scope of his employment. *Yunker*, 496 N.W.2d at 422. Subsumed in these requirements is the need for Doe to have alleged that the harm Smith caused was foreseeable to Carleton. *Doe 175 v. Columbia Heights Sch. Dist.*, 873 N.W.2d 352, 359 (Minn. Ct. App. 2016).

Foreseeability in the context of negligent supervision differs from the foreseeability requirement in Doe's other vicarious liability claims. For negligent supervision, Doe must

27

plausibly allege that Carleton "should have reasonably anticipated [Smith's] *specific misconduct*." *Fahrendorff*, 597 N.W.2d at 912 (explaining distinction between foreseeability in negligence and foreseeability in vicarious liability) (emphasis added). "In determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998). "Sexual abuse 'will rarely be deemed foreseeable in the absence of prior similar incidents.'" *Doe 175*, 873 N.W.2d at 360 (quoting *K.L. v. Riverside Med. Ctr.*, 524 N.W.2d 300, 302 (Minn. Ct. App. 1994)); *see also Doe 175*, 873 N.W.2d at 359 (finding that "red flags" including the student yelling "I love you" to the teacher in public, observing the two speaking on school grounds, and observing the teacher alone with a different young girl on school grounds, were "not sufficiently similar to or indicative of sexual abuse as to give the school district notice that an inappropriate relationship existed between [plaintiff] and [teacher (or coach)]."). Doe must plausibly allege each element of negligent supervision—"speculation and innuendo are not sufficient." *Doe 175*, 873 N.W.2d at 359.

Doe does not allege facts that plausibly show the specific danger posed by Smith was foreseeable to Carleton. At most, she states that "upon information and belief," Dean Livingston saw her coming and going from Smith's house "on several occasions." (Compl. ¶ 71). Doe's therapist contacted Dean Williams stating Doe needed academic accommodations. (*Id*. ¶ 172). Doe herself reported to Dean Williams she had been "assaulted by a Carleton staff member," without naming Smith. (*Id*. ¶¶ 182-183). Doe also

alleges that Prof. Howard notified Riehle-Merrill that she observed "excessive closeness" between a student and a teacher "that may or may not merit concern." (*Id*. ¶¶ 198-200). Finally, Doe asserts flatly, with no supporting factual allegations, that Prof. Howard, as the faculty supervisor of an independent study, "provided no supervision of Smith." (*Id*. ¶¶ 211-212). That is the extent of Doe's allegations that reasonably go to foreseeability in the context of negligent supervision.

These sparse allegations do not plausibly show Carleton should have expected the "specific danger" posed by Smith. At most, even if true, these allegations might show that the specific danger was "within the realm of . . . conceivable possibility," but the Minnesota Supreme Court has emphasized that this is not enough to state a claim for negligent supervision. *Whiteford by Whiteford*, 582 N.W.2d at 918.

And as noted, under Minnesota law, sexual abuse is rarely foreseeable without "*prior similar incidents*." *Doe 175*, 873 N.W.2d at 360 (quoting *K.L.*, 524 N.W.2d at 302) (emphasis added, quotations omitted). Here, there is no allegation that Smith was involved in any "prior similar incident" of sexual abuse, let alone that Carleton reasonably should have known about any such prior incidents. In the absence of prior incidents, Minnesota courts are reluctant to find the specific danger of sexual abuse to have been foreseeable, even when "red flags" may have been observed. *Id.*; *compare* Somermeyer Decl. Ex. 4 (describing "some yellow flags and some questions"). Doe has not alleged that Carleton could have foreseen that Smith posed the specific danger of sexual abuse. Her negligent supervision claim accordingly fails.

## **CONCLUSION**

Carleton respectfully requests that the Court dismiss all of Doe's claims with prejudice.

SOMERMEYER SULLIVAN PLLC

Dated:  August 19, 2024

*s/ Sean R. Somermeyer*
Sean R. Somermeyer #391544
 *ssomermeyer@somsull.com*
Timothy M. Sullivan #391528
 *tsullivan@somsull.com*
3900 Capella Tower
225 South Sixth Street
Minneapolis, MN 55402
(612) 643-3486

*Attorneys for Defendant Carleton College*