**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jane Doe,

Plaintiff,

v.

Carleton College,

Defendant.

Civil No. 24-2300 (DWF/SGE)

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

This matter is before the Court on Defendant Carleton College's ("Carleton") motion to exclude the expert testimony of Kaori Kenmotsu (Doc. No. 73) and motion for summary judgment (Doc. No. 79). Plaintiff Jane Doe opposes both motions. (Doc. Nos. 84, 90.) For the reasons set forth below, the Court grants in part and denies in part each motion.

## BACKGROUND

Carleton is a private liberal arts college in Northfield, Minnesota with approximately 2,000 students. Doe was a student at Carleton between 2019 and 2023. While she was a student, Doe got involved in dance, first participating in Carleton's social dance club, then taking two salsa classes and an independent study in dance with Carleton staff member Donald Smith. Over time, Doe and Smith's relationship devolved, becoming inappropriate and abusive. Doe now sues Carleton based on its hiring, retention, and supervision of Smith under theories of direct and vicarious liability.

## I. Carleton Hires Smith

In February 2019, Smith applied for a position at Carleton as a Data Research Associate. (Def. App. at 359-65.)[1] After narrowing the pool of applicants and hosting on-campus interviews, the hiring committee unanimously decided to hire Smith. (*Id.* at 158-59, 165-66, 371.) Before making the offer, Carleton conducted a reference check, contacting both Smith's current supervisor and the former director of institutional research at Tufts University, who gave Smith a glowing review. (*Id.* at 110, 113-14, 161.) Assistant Vice President Todd Jamison made the offer of employment to Smith on April 9, 2019, contingent upon a background check. (*Id.* at 110, 166.) Smith submitted the background check form that same day. (*Id.* at 374.) Notably, on this form, Smith excluded purported prior employers that he had listed on his resume. (*See id.* at 369, 373-78.) At least one of those employers had no record of Smith ever working there. (*See id.*; Pl. App. at 1277-78.) Carleton's third-party background check vendor conducted the check using what Smith included on his form and found no criminal history or related concerns. (Def. App. at 373-78.) Smith began his position on June 5, 2019. (*Id.* at 381.)

---

[1] Each party filed a paginated appendix of exhibits. (Doc. Nos. 82, 90-3, 90-4, 90-5, 90-6.) Throughout this Opinion, the Court uses the abbreviation "Pl. App." to refer to Doe's appendix (Doc. Nos. 90-3, 90-4, 90-5, 90-6) and "Def. App." to refer to Carleton's appendix (Doc. No. 82). There is substantial overlap between the appendices. For the sake of brevity, the Court only cites to one appendix even where a document is included in both appendices. The Court uses each appendix's "A" page numbers.

## II. Smith Begins Teaching Salsa

One day after starting at Carleton, Smith contacted Judith Howard, Chair of the Theater and Dance Department, to express interest in dance instruction at Carleton. (*Id.* at 381-82.) Howard suggested that Smith contact the Physical Education and Recreation ("PEAR") Department and informed him about Carleton's social dance club. (*Id.* at 381.) Carleton students are required to take four physical education courses. (*Id.* at 341.) PEAR courses can be taught by anyone, including faculty, staff, students, or individuals not affiliated with Carleton. (*See id.* at 343-44.) Instructors hired from outside Carleton must pass a criminal background check before teaching. (*Id.*) Carleton does not conduct a second background check for current faculty or staff members who teach a PEAR course. (*See id.* at 350.)

Smith followed up on Howard's PEAR suggestion. In October 2019, Smith submitted a detailed course proposal to the curriculum committee for a PEAR course called Salsa I. (*Id.* at 400-03.) Smith agreed to instruct the course on a volunteer basis. (*Id.* at 410.) The curriculum committee approved the course for winter term 2020. (*Id.* at 405.) When reviewing Smith's proposal, no one on the curriculum committee verified Smith's purported prior dance experience that he included with his proposal. (Pl. App. at 517-18.) The committee was aware that Smith had talked with Howard previously and that "[s]he would know if a person knows their stuff as far as dance." (*Id.* at 522.) At that time, Howard had not observed Smith dance or teach dance. Additionally, Howard never looked into Smith's purported dance experience. (*Id.* at 199.) At least two of the organizations Smith listed on his proposal had never heard of him. (*Id.* at 1315, 1317.)

In the fall of 2019, the social dance club invited Smith to teach a salsa workshop. (Def. App. at 389-90.) Doe was one of approximately thirty students in attendance. (*Id.* at 27-28.) Following the workshop, Smith asked the club's student leaders to advertise his PEAR salsa course for winter term, and they agreed. (*Id.* at 389.) Also during the fall term, Howard asked Smith to present a guest lesson in her Cultures of Dance Class. (*Id.* at 129-30.) After watching his lesson, Howard thought Smith was competent and sensitive to the issues of gender and touch. (*Id.*)

Before he began teaching Salsa I, Smith reached out to Laura Riehle-Merrill, Carleton's Title IX Coordinator, to ask for guidance on making students feel comfortable in class. (Pl. App. at 562.) During the exchange, Smith asked Riehle-Merrill if it would be appropriate to tell students that their dancing was "hot" or "sexy." (*Id.*) She said those terms would be inappropriate and advised him to say "good job" instead. (*Id.* at 563.)

## III. Smith and Doe's Relationship

After attending Smith's salsa workshop, Doe enrolled in Salsa I for the 2020 winter term. (Def. App. at 28-29.) During the course, Doe and Smith developed a close relationship. (*Id.* at 31-32.) They began taking walks together and communicating more frequently about personal details. (*Id.*) In March 2020, Doe and two other students went to Smith's house for dinner with him and his wife. (*Id.* at 32.)

After Salsa I ended, Smith left a note in Doe's student mailbox asking if she would be his salsa co-instructor in future classes. (*Id.* at 34.) During winter break, Doe and Smith met approximately ten times in Smith's office so Smith could continue teaching

Doe. (*Id.*) During those meetings, Smith made inappropriate comments, expressed his attraction to Doe, and touched her in ways that made her uncomfortable. (*Id.* at 35.) Doe had some interaction with Smith during the 2020 spring term, including spending the night at his home. (*Id.* at 36.) Doe had no concerns about that visit and had minimal contact with Smith for the rest of the term. (*See id.*)

Doe became Smith's co-instructor for Salsa I during the 2021 fall term. (*Id.* at 490.) He offered to pay her $17.25 per hour for her time. (*Id.*) Smith's PEAR supervisor was unaware that Smith had a co-instructor for Salsa I. (*Id.* at 41, 845.) At that time, the PEAR Department did not hire students as co-instructors for PEAR courses that were taught by Carleton faculty or staff. (*Id.* at 845.) Smith paid Doe via personal check. (*Id.* at 40.) As a co-instructor, Doe was required to participate in the class two times per week and meet with Smith for an hour on the weekends to prepare for class. (*Id.* at 42.) The lesson planning meetings took place at Smith's house. (*Id.* at 41.) Doe also enrolled in Smith's Salsa II class that term. (*Id.* at 42.) Altogether, Doe spent about five hours per week with Smith. (*See id.*) As the term progressed, Smith's behavior escalated. For example, he shared inappropriate personal information about his sex life and capacity for violence. (*Id.* at 43-44.)

At the start of winter break 2021, Doe spent two nights at Smith's home during the two-day gap between the closure of her dorm and her flight to visit family. (*Id.* at 44-45.) On the second night, Smith invited Doe to see his basement and asked her to play "truth or dare." (*Id.* at 45.) Smith poured her a drink and after she finished it, Doe began to feel "weird and ill." (*Id.*) Smith pressured her to have another. (*Id.*) Doe's memory of the

rest of the night is hazy, but she remembers Smith making several inappropriate sexual comments toward her. (*Id.*) At some point, Doe ran upstairs to vomit and then went to bed. (*Id.* at 45-46.) When she woke up the next morning, there were red marks around her neck. (*Id.* at 45.) Doe did not report the incident to Carleton or the police at the time. (*Id.* at 51.)

On January 28, 2022, Smith invited Doe to his house for a birthday "surprise." (*Id.* at 52.) When she arrived, Smith led her to the basement where there were twenty-one pieces of colored paper face-down on the table. (*Id.*) Smith told Doe to turn over the pieces of paper one-by-one. (*Id.*at 52-53.) Each paper had some kind of "reward" or "punishment" written on it. (*Id.*) The punishments included sexually inappropriate conduct, including hitting. (*Id.* at 53.) Eventually Doe insisted that the game stop and they went upstairs. (*Id.*) Once upstairs, Smith and Doe practiced dancing. (*Id.*) Afterwards, Smith bit Doe on her ear or shoulder, grabbed her arm and throat, and made sexually charged comments toward her once again. (*Id.*) Doe left shortly thereafter. (*Id.*)

## IV. Doe's Initial Reports and Howard's Concerns

A few days later, Doe told her therapist about this incident, and they agreed that Doe's therapist would contact the Associate Dean of Students, Trey Williams. (*Id.* at 54-55.) Williams arranged a meeting with Doe for February 9, 2022. (*Id.* at 55, 80.) Doe told Williams that one of her teachers attacked her at his house, that it had been affecting her academically, and that she needed help making it through the term. (*Id.* at 55.) Doe did not tell Williams Smith's name at the time because she was afraid. (*Id.* at 56.) Following the meeting, Williams submitted a form to the Title IX office describing his

February 9th meeting with Doe and further discussed the situation during a CARE Team meeting. (*Id.* at 268, 327, 616.) The CARE Team agreed that Williams would help Doe academically and Riehle-Merrill would contact her about support resources. (*Id.* at 268, 327.) Riehle-Merrill invited Doe to meet with her, but Doe never responded. (*Id.* at 58, 850, 980.)

Doe finished winter term but failed two courses, so Carleton placed her on Academic Review. (*Id.* at 59, 663.) Smith suggested that Doe participate in an independent study with him to recover credits. (*Id.* at 59.) Howard was the supervisor of the independent study. (Pl. App. at 200.) As supervisor, she was tasked with approving the course proposal and checking in at the end. (*Id.*) In preparation for the independent study, Smith and Doe performed a bachata dance for Howard. (*Id.* at 202.) Howard felt uncomfortable watching the dance and contacted Riehle-Merrill. (*Id.*) She was concerned about the power dynamic in the particular style of dance. (*Id.*)

Howard and Riehle-Merrill met in March 2022 to discuss the situation. (*Id.* at 203.) Some of Riehle-Merrill's notes from the meeting include "Judith feels this is grooming" and "Teacher 'gets off on this.'" (*Id.* at 1383.) After the meeting, Howard met separately with Doe and Smith to discuss the independent study. (*Id.* at 204.) After meeting with Howard, Smith and Doe rewrote the independent study proposal. (*Id.* at 206.) Howard was satisfied with the conversations and the new proposal, so she signed off on the independent study. (*See id.*) Around the same time, Howard contacted Riehle-Merrill to let her know about the "good results," identifying both Smith and Doe by name. (*Id.* at 1419.)

During the 2022 spring term, Smith's physical harassment became "near constant." (Def. App. at 64.) In April 2022, Doe received a letter purportedly from "Katie," Smith's dance partner, encouraging Doe to have a sexual relationship with Smith. (Pl. App. at 1441.) Doe suspected Smith wrote the letter himself, and when she did not mention it to him, he sent her a lengthy text message with the letter's exact wording. (*Id.*)

Later in April, Doe met with Dean of Students Carolyn Livingston regarding missed COVID-19 tests. (Def. App. at 66.) Doe told Carlson that she was attacked by a Carleton employee earlier in the year and asked for help. (*Id.*) Doe did not identify Smith at the time. (*Id.*) Riehle-Merrill contacted Doe again to offer support, but Doe did not respond. (*Id.* at 68, 850.)

## V. Doe's Final Report and Smith's Firing

Also in April 2022, Doe's boyfriend at the time became concerned about Doe and Smith's relationship and reached out to Riehle-Merrill for advice. (*Id.* at 67, 277-78.) Doe's boyfriend and Riehle-Merrill met multiple times. (*Id.* at 277-78.) Eventually he shared that the individual was a Carleton employee who held two roles. (*Id.* at. 278.) On May 9, 2022, Doe finally decided to report Smith by name to the Title IX Office. (*Id.* at 69.) Doe and Riehle-Merrill met later that day, where Doe disclosed the inappropriate physical contact and inappropriate comments and identified Smith. (*Id.*)

Riehle-Merrill was concerned about Smith's presence on campus and immediately consulted Human Resources. (*Id.* at 280.) She determined that the matter should be handled as an employment matter rather than a Title IX investigation because Doe did not

want to go through a lengthy investigation or hearing process. (*Id.*) Carleton fired Smith on May 13, 2022, and he was promptly escorted off campus. (*Id.* at 680, 783.)

**VI. This Case**

Doe filed this action against Carleton on June 17, 2024. She brings six claims, all under Minnesota law: (1) vicarious liability assault and battery; (2) vicarious liability sexual abuse; (3) negligent retention; (4) negligent supervision; (5) vicarious liability negligence; and (6) negligent hiring. (Doc. No. 53 ¶¶ 367-413.) Carleton moves for summary judgment on all claims and moves to exclude the testimony of Plaintiff's expert Kaori Kenmotsu. (Doc. Nos. 73, 79.)

## DISCUSSION

**I. Motion to Exclude Expert Testimony**

Before accepting the testimony of an expert witness, the trial court is charged with the "gatekeeper" function of determining whether an opinion is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993). Rule 702 of the Federal Rules of Evidence allows opinion testimony from a duly qualified expert if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods; and" (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the expert testimony must demonstrate these prerequisites by a preponderance of the evidence. Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 592. The Eighth Circuit has

summarized Rule 702 in a three-part test of admissibility: (1) the evidence is based on some specialized knowledge that is relevant and helpful for the trier of fact; (2) the proposed witness is qualified to give such testimony; and (3) the evidence is reliable. *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

An expert may rely on their own experience to form their opinions, but they also must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 826 (D. Minn. 2011) (quoting Fed. R. Evid. 702 advisory committee note to 2000 amendment). Courts consider the factors set out in *Daubert* to determine reliability, which include: (1) whether the theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) any known or potential error rate; and (4) whether the theory is generally accepted in that field. *Daubert*, 509 U.S. at 593-94. However, "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rule 702 favors admissibility over exclusion, so courts should generally resolve doubts in favor of admissibility. *Lauzon*, 270 F.3d at 686.

Carleton argues that Kenmotsu's expert testimony should be excluded because she is not qualified to opine on the issues included in her report, she does not cite any reliable facts or data, and her opinion will not assist the jury. (Doc. No. 75.) Kenmotsu has over twenty years of experience as a faculty member and lecturer in college dance departments

and significant experience as a director, choreographer, and dancer. (*See* Doc. No. 76-5.) Her academic work has focused on "dance pedagogy, power dynamics in the arts, and cross-cultural perspectives in performance." (Doc. No. 76-3 at 4.) Her research and teaching has included "issues of body autonomy, consent, and ethical pedagogy within dance and theater." (*Id.*) Kenmotsu provided four opinions that can be broken down into three categories: (1) the heightened risk of sexual misconduct in dance instruction; (2) the heightened duty of care Carleton owed due to this risk; and (3) that Carleton breached that duty. (*See* Doc. No. 76-3 at 10-11.) She reviewed several depositions and email exhibits from this case, as well as articles on the topics of power dynamics and sexual misconduct in dance. (*See id.* at 3.)

After a thorough review, the Court will allow Kenmotsu to testify about the heightened risk of sexual misconduct in dance instruction, which includes her testimony about hierarchies and dance pedagogy. Kenmotsu's experience is significant and qualifies her to give an opinion on risks in dance instruction, especially in the college setting. This information will be useful to the jury because the average jury is not familiar with college dance instruction and the surrounding culture. Carleton's arguments are well taken but go more to Kenmotsu's credibility and the weight the jury should give her opinion. Carleton is, of course, welcome to cross-examine Kenmotsu on those points and make those arguments in closing at trial.

However, the Court will not allow Kenmotsu to testify about the duty of care Carleton owed and that Carleton breached that duty because Kenmotsu does not have sufficient experience to testify about these topics. Her experience hiring guest artists to

work with her students as a faculty member and program director do not qualify her to speak to the duty of care owed more generally. Moreover, Doe has not shown that Kenmotsu's testimony is sufficiently reliable on these issues. Accordingly, the Court grants in part and denies in part the motion to exclude.

## II. Summary Judgment

Summary judgment is proper if the moving party shows that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

### A. Counts I and II: Vicarious Liability Assault and Battery and Vicarious Liability Sexual Abuse

In Minnesota, employers may be held vicariously liable for torts committed by their employees within the course and scope of their employment. *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 583 (Minn. 2008). "[A]n employer may be held liable

for even the intentional misconduct of its employees when (1) 'the source of the attack is related to the duties of the employee,' and (2) 'the assault occurs within work-related limits of time and place.'" *Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999) (quoting *Lange v. Nat'l Biscuit Co.*, 211 N.W.2d 783, 786 (Minn. 1973)). An employee's act need not be committed in furtherance of the employer's business to fall within the scope of employment. *Id.* But "the employee's acts must be foreseeable, related to and connected with acts otherwise within the scope of employment." *Frieler*, 751 N.W.2d at 583.

To be foreseeable, there must be some evidence that such misconduct was a "well-known hazard" in that field. Generally, Minnesota courts have found that expert testimony is required to create a genuine issue of material fact on foreseeability. *Compare Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1982) (finding a fact issue on foreseeability where there was expert testimony about the well-known hazard of sexual relations between a psychologist and patient), *with P.L. v. Aubert*, 545 N.W.2d 666, 668 (Minn. 1996) (finding no evidence that sexual relationships between teachers and students were foreseeable because "no expert testimony or affidavits were presented regarding the potential for abuse of such power in these situations").

For Doe's claims of vicarious liability assault and battery and vicarious liability sexual abuse to survive summary judgment, there must be evidence that assault, battery, and sexual abuse are well-known hazards between dance teachers and students. Carleton relies in part on its motion to exclude arguments and otherwise argues that Kenmotsu's

opinion is too vague on the issue of foreseeability. The Court denied Carleton's motion to exclude Kenmotsu's testimony that relates to foreseeability, so those arguments are moot. In addition, the Court respectfully disagrees with Carleton's characterization of Kenmotsu's testimony. Kenmotsu included in her opinion that there is a heightened risk of sexual misconduct in the field of dance instruction. (*E.g.*, Doc. No. 76-3 at 8.) This is not vague and creates a genuine issue of fact on foreseeability. Carleton also seems to suggest that generalized opinions about the risk of "sexual misconduct" are insufficient and that Kenmotsu needed to opine on the prevalence of specific conduct like "hitting" or "biting," among other things. Carleton provides no support for this assertion and the Court rejects it. Doe has created a genuine issue of material fact on foreseeability, so the Court denies Carleton's motion for summary judgment on Counts 1 and 2.

**B. Counts 3 and 6: Negligent Retention and Negligent Hiring**

Negligent hiring and negligent retention impose direct liability on an employer for an employee's intentional torts, even those outside the scope of employment, "when the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct." *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. Ct. App. 1993). An employer is negligent in hiring or retention by "placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others." *Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 911 (Minn. 1983).

**i. Negligent Retention**

Carleton argues that Doe's negligent retention claim fails because there is no evidence that Carleton knew or should have known that Smith was dangerous before Doe reported him by name to the Title IX Office. (Doc. No. 81 at 23-29.) Doe counters that a reasonable jury could conclude that Carleton recognized the escalation of Smith's behavior and allowed him to continue instructing Doe anyway. (Doc. No. 90 at 46-48.)

The Court agrees with Doe. A reasonable jury could find in Doe's favor based on the information reported to various Deans and Riehle-Merrill before Doe's report on May 9, 2022. Negligent retention occurs when "the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment." *L.M. ex rel. S.M. v. Karlson*, 646 N.W.2d 537, 545 (Minn. Ct. App. 2002) (quoting *Yunker*, 496 N.W.2d at 423-24). Carleton argues that no one reported Smith's misconduct prior to May 9, 2022, so it did not know about Smith's dangerous propensities and could not have acted any sooner. (Doc. No. 81 at 27.) It also argues that it acted reasonably each time it received additional information about the situation between Doe and Smith. (*Id.* at 28.)

The Court respectfully disagrees with Carleton. Unlike some of the cases it relies on, Carleton had some information about Smith's dangerous propensities prior to Doe's May 9th report. The important question is whether the information Carleton had was enough that it should have been aware of Smith's unfitness and whether it acted reasonably with the information it had. A reasonable jury could find that Carleton should

have known about Smith's propensities based on the information it had prior to May 9th and that Carleton did not act reasonably. Accordingly, the Court denies summary judgment on Count 3.

Carleton also argues that expert testimony is required to establish a standard of care for negligent hiring, retention, and supervision claims. (Doc. No. 81 at 33.) Minnesota law requires expert testimony for negligence claims "if it would be speculative for the factfinder to decide the issue of negligence" without expert testimony. *SECURA Ins. Co. v. Deere & Co.*, 12 N.W.3d 103, 111 (Minn. Ct. App. 2024) (citation modified). The Court excluded Kenmotsu's testimony about the standard of care above; however, Carleton has not explained why having a jury decision on that question would be speculative. Unlike medicine or law, higher education administration "is not a field that is so highly technical that the public cannot understand at least the general nature of" school officials' responsibilities. *Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985). Without further argument to the contrary, the Court will allow this claim to move forward.

**ii. Negligent Hiring**

Carleton argues Doe's negligent hiring claim fails because Carleton did not know and should not have known that Smith was unfit. (Doc. No. 81 at 24.) In response, Doe points out that Smith lied about one job on his resume and that Carleton would have discovered this if it had conducted an appropriately rigorous investigation. (Doc. No. 90 at 40-44.) She further asserts that "Smith's fabricated credentials . . . bear directly on his trustworthiness, willingness to manipulate institutional processes, and suitability for

positions involving unsupervised authority, close access to students, and access to sensitive student data." (*Id.* at 43.)

The Court finds that there is no evidence that Carleton knew or should have known that Smith was dangerous at the time of his hiring. While there may have been a discrepancy on Smith's resume, someone who lies on their resume should not immediately be considered to have violent or aggressive propensities. Doe has not shown any evidence of something bearing on Smith's violent propensity that Carleton should have discovered with a more rigorous background check.

Doe asserts a second theory under her negligent hiring claim about Smith's approval to teach a PEAR course. (Doc. No. 90 at 44-46.) While perhaps Carleton should have more carefully scrutinized Smith's credentials when approving his PEAR course, Doe still has not shown that a more rigorous investigation would have shown that Smith had violent or aggressive propensities. Accordingly, the Court grants summary judgment in favor of Carleton on Count 6.

**C. Count 4: Negligent Supervision**

Negligent supervision derives from the respondeat superior doctrine but focuses on the employer's fault for liability. *Doe YZ v. Shattuck-St. Mary's Sch.*, 214 F. Supp. 3d 763, 785 (D. Minn. 2016) (citing *M.L. v. Magnuson*, 531 N.W.2d 849, 856 n.3, 858 (Minn. Ct. App. 1995)). "To make out a successful claim for negligent supervision, the plaintiff must prove (1) the employee's conduct was foreseeable; and (2) the employer failed to exercise ordinary care when supervising the employee." *C.B. ex rel. L.B. v. Evangelical Lutheran Church in Am.*, 726 N.W.2d 127, 136 (Minn. Ct. App. 2007).

Foreseeability for negligent supervision differs from the definition of foreseeability for vicarious liability. For negligent supervision, "foreseeability means a level of probability which would leave a prudent person to take effective precautions." *Doe YZ*, 214 F. Supp. 3d at 786 (citation modified). "Sexual abuse will rarely be deemed foreseeable in the absence of prior similar incidents." *Doe 175 ex rel. Doe 175 v. Columbia Heights Sch. Dist.*, 873 N.W.2d 352, 360 (Minn. Ct. App. 2016) (citation modified). "When the issue of foreseeability is clear, the courts, as a matter of law, should decide it." *Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998).

Carleton argues that Smith's tortious conduct was not foreseeable. (Doc. No. 81 at 30-31.) Doe argues that the foreseeability inquiry is more general and that the risks of the relationship between the two as instructor-student doing a sensual dance was enough to make sexual abuse foreseeable. (Doc. No. 90 at 36-37.) Like Counts 1 and 2, the Court finds that there is a genuine issue of fact on foreseeability. As the Court explained above, Carleton had some information about Smith's abuse from Doe herself and Howard. Whether that information made Smith's conduct foreseeable is a close question that should be resolved by a jury.

Carleton also argues that Doe cannot show that Carleton failed to exercise reasonable care in its supervision. (Doc. No. 81 at 31-33.) Doe counters that Carleton imposed no meaningful safeguards after Howard expressed concerns about Doe and Smith's dynamic. (Doc. No. 90 at 48-49.) Although Carleton had some policies and protections in place, a reasonable jury could find that Carleton should have done more after Howard expressed concerns about Doe and Smith's independent study proposal and

therefore failed to exercise reasonable care. This issue is best left to a jury to decide. Accordingly, the Court denies summary judgment on Count 4.

### D. Count 5: Vicarious Liability Negligence

Carleton argues that Doe does not allege any separate negligence by Smith that caused physical injury, that Smith's conduct was not within the scope of his duties or in furtherance of Carleton's interests, and that Doe waived any arguments because she failed to respond on this count. (Doc. No. 81 37-38; Doc. No. 92 at 12.) At the hearing, Doe's counsel claimed that Doe did not intend to abandon this count and that she addressed Carleton's arguments in her sections about foreseeability generally. First, the vicarious liability test for negligence differs from that for intentional torts. *See Marston*, 329 N.W.2d at 309-10. Second, even if that discussion was sufficient, Doe did not address Carleton's other challenges to her negligence claims. She has not clearly alleged or provided evidence to show that Smith committed some act of negligence within the scope of his employment. Accordingly, the Court grants summary judgment in favor of Carleton on Count 5.

## CONCLUSION

Counts 1, 2, 3, and 4 survive summary judgment, but Counts 5 and 6 do not. The Court cautions that a partial victory here for Doe does not guarantee a victory at trial. The Court encourages the parties to consider settlement rather than further litigation. Settling this case is in the best interests of both parties.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1. Defendant Carleton College's motion to exclude the expert testimony of Kaori Kenmotsu (Doc. No. [73]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Kenmotsu may testify as to the heightened risk of sexual misconduct in dance instruction, including information about hierarchies and dance pedagogy.

    b. Kenmotsu is barred from testifying about Carleton's duty of care in hiring, retaining, and supervising employees.

2. Defendant Carleton College's motion for summary judgment (Doc. No. [79]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. The motion is granted as to Counts 5 and 6.

    b. The motion is denied as to Counts 1, 2, 3, and 4.

3. Counts 5 and 6 are **DISMISSED WITH PREJUDICE**.

Dated: August 20, 2026

s/Donovan W. Frank
DONOVAN W. FRANK
United States District Judge